JOEL A. LUTZ and ELAINE B. LUTZ, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Lutz v. Commissioner
Docket No. 1725-74
United States Tax Court
T.C. Memo 1976-146; 1976 Tax Ct. Memo LEXIS 258; 35 T.C.M. (CCH) 661; T.C.M. (RIA) 760146; May 10, 1976, Filed Clyde B. Pritchard, and David Lieberman, for the petitioners. Ronald T. Murphy, for the respondent. HALL MEMORANDUM FINDINGS OF FACT AND OPINION HALL, Judge: Respondent determined a deficiency in petitioners' 1968 Federal income tax of $18,314.55. The only issue is how much petitioners are entitled *259 to deduct as a casualty loss arising from flood damage to their home in 1968. FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioners filed a joint income tax return in 1968.At the time they filed their petition, they resided in Farmington, Michigan. Elaine B. Lutz is a party only by virtue of having filed a joint income tax return with her husband, and Joel A. Lutz will be referred to herein as petitioner. Petitioner and his family have resided in their home in Farmington since late in 1962. The house, which was constructed in 1958, is a large ranchstyle house situated on a large lot, with extensive landscaping, a swimming pool and a large basement with a ten foot high ceiling. In 1965 petitioner put a new roof on the house, which showed no signs of leakage between 1965 and 1968. The house was located in the lowest lot in the neighborhood, and there were recurring problems with drainage in the rear of the lot during periods of rain.
During the day of June 25, 1968, heavy rains fell in the Farmington area. Water began to accumulate, first in the back of petitioner's property and later also in the front. As the water level rose, the basement *260 gradually began to fill with water. Soon water was pouring into the basement through the basement windows. In the late afternoon a thirty to forty foot section of the basement wall on the side of the house facing the street collapsed, and the basement was completely flooded. Petitioner and his family were forced to evacuate. Portions of the first floor of the home were also flooded and left covered with mud. Although the water receded in three days, a month went by before petitioner and his family could return home. The flood waters caused extensive damage to the contents of the basement. Clothing, desks, shelves, wall partitions, and other items which petitioner had stored in the basement were damaged. The furnace, the air conditioning unit, sump pumps, a water softening device, a washer and dryer, and a freezer, all situated in the basement, were also damaged. The action of the flood waters also created a hole in the yard directly in front of that portion of the basement wall which had collapsed. The hole extended about eight feet from the wall towards the street and was approximately four feet deep. In the rear of the house the flood waters lifted petitioner's swimming *261 pool out of the ground and left it elevated at an angle. Petitioner's landscaping in both the front and rear of the house was badly damaged by the flood. Petitioner began repair work almost immediately after the flood. Petitioner's uncle operated a commercial masonry business, and he agreed to undertake at cost that portion of the repairs which his firm could handle. He did general cleaning up work and replaced the underground drainage system. As part of his work, petitioner's uncle installed concrete block pilasters throughout the entire basement to provide additional support. He subcontracted the electrical, plumbing, and heating repairs to other firms. Petitioner replaced the damaged shrubbery. He decided that the swimming pool was so damaged that repairing it would be too costly. Instead he had the walls of the pool bulldozed inward and the pool filled in, and he built a new pool in another section of the backyard. Petitioner set up a separate checking account to pay for all these repairs. However, after the repairs were completed, petitioner used this bank account for purposes unrelated to the flood. Prior to this conversion of the account to non-flood purposes, *262 petitioner had issued checks totaling $32,583.48, certain of which were made out to petitioner's wife and to other unidentified payees.
Petitioner contacted his insurance company the day after the flood and was soon informed that losses due to floods were outside the protection of his policy. He has never received any compensation for his flood loss. Other problems began to manifest themselves after the flood. Petitioner began to experience leaks in his roof, and cracks appeared in the basement walls and in certain other walls in the house. The parties agree that petitioner's adjusted basis in the property immediately preceding the flood was greater than $62,000. Petitioner in his 1968 income tax return reported a casualty loss of $62,716. Respondent determined that petitioner suffered a casualty loss of $19,663.67, $18,000 representing loss to house, land, and improvements, and $1,633.67 damage to personal property. ULTIMATE FINDINGS OF FACT The addition of pilasters to the basement walls as part of the post-flood repair work was an improvement to the property. The fair market value of petitioner's house, land, and improvements prior to the flood was $82,000; the *263 post-flood fair market value of the house, land, and improvements was $57,000; therefore petitioner sustained a flood loss in 1968 to house, land, and improvements of $25,000. Petitioner sustained a loss in personal property of $2,500. OPINION Petitioner deducted from adjusted gross income the amount of the losses to house, land, improvements, and personal property which he contends he sustained as a result of severe flooding in the late spring of 1968. Section 165(c) [1] permits an individual a casualty loss deduction. Section 165(b) limits the loss deduction to the damaged property's adjusted basis provided in section 1011 for determining loss from the sale or other disposition of property. The regulations contain two methods of determining the amount of a casualty loss. The first method involves the use of competent appraisers to measure the decline in fair market value of the property due to the casualty. Under this method, petitioner must seek the opinions of competent appraisers as to the fair market value of the property immediately before and immediately *264 after the casualty. Section 1.165-7(a)(2)(i), Income Tax Regs.For a residence, the estimate of fair market value also includes the damage sustained to improvements, including trees, shrubbery, and buildings. Section 1.165-7(b)(2)(ii), Income Tax Regs.
The second method in the regulations allows petitioner to equate his loss with his cost of repairs, provided that (1) the repairs restore the property to its pre-flood condition, but do not improve it, (2) the cost of the repairs is not excessive, (3) only that part of the property damaged in the flood is repaired, and (4) the value of the property after the repairs is not greater than the value of the property before the flood. Section 1.165-7(a)(2)(ii), Income Tax Regs.
The application of either method described in the regulations involves questions of fact ( Donald G. Graham,35 T.C. 273, 278 (1960)), and the burden or proof rests on petitioner (Rule 142(a), Tax Court Rules of Practice and Procedure). Both parties agree that petitioner sustained a casualty and only disagree as to amount. Petitioner contends that, under either of the methods of proof set forth in the regulations, he has suffered a flood loss *265 to his house, land and improvements in excess of $60,000. Respondent contends that petitioner sustained only an $18,000 loss. Petitioner argues that under the regulations' first method for calculating loss he has submitted competent appraisals substantiating his loss. Petitioner contacted two real estate appraisers, Nyla Archer ("Archer") and Gaylord Lehman ("Lehman"), soon after the flood. Each appraiser visited the property before the repairs were begun and again soon after the repairs were completed. When the appraisers viewed the house the second time, petitioner told them that it was in substantially the same condition as it had been prior to the flood. Petitioner instructed them to estimate the pre-flood value of his property upon this assumption. Archer estimated the property's preflood value to be $100,000 and its immediate post-flood value to be $25,000. Lehman estimated the pre-flood value to be $93,000 and the immediate post-flood value to be $54,738. We conclude that only very limited weight can be assigned to Archer's appraisal figures. Archer was not called as a witness, nor were her qualifications submitted into evidence. In addition, her one-page report *266 was vague, conclusory, and ambiguous. Petitioner did call the second appraiser, Gaylord Lehman, as a witness, and reviewed Lehman's qualifications summarily but sufficiently. However, we have several difficulties with Lehman's pre-flood estimate. First, it was not buttressed by evidence of comparable sales. Further and more importantly, petitioner's instructions to Lehman raise questions about Lehman's estimate of pre-flood value. Petitioner had instructed Lehman to base his pre-flood estimate upon the condition of the house after the repairs had been completed. However, as noted in our findings of fact, the house at that point in time included an extensive network of pilasters in the basement which had not been present prior to the flood. Petitioner and his expert witness affirmed that the pilasters provided new extra support for the basement walls. We have found as a fact that the addition of the pilasters was not a repair, but rather an improvement. Thus when Lehman estimated pre-flood value, if he followed petitioner's instruction (and there is no evidence to suggest that he did not), Lehman must have included the value of the pilasters in his estimate. The record does not *267 reveal how much of Lehman's estimate can be allocated to the pilasters. In 1971 respondent had Mr. Mathew Novak ("Novak") appraise the property. He estimated the pre-flood value at $75,000 and the post-flood value at $57,000. Although we found Novak's education and experience to be less extensive in the area of real estate appraising than we might have wished, we were impressed by the extent and thoroughness of his investigation. Considering all the facts and circumstances, including the appraisal evidence, we conclude that the pre-flood value was $82,000 and the post-flood value was $57,000. Several cases suggest an alternate hybrid approach to determine post-flood fair market value for purposes of the regulations' first method, namely, that post-flood fair market value should be computed by subtracting from the preflood fair market value the cost of repairs actually completed plus the cost of repairs which still need to be done to restore the property to its pre-flood physical condition. E.g., Anne Marie Hagerty,34 T.C.M. 356, 44 P-H Memo. T.C. par. 75,066 (1975); Miree v. United States, 62-2 USTC par. 9756, 10 AFTR 2d 5843 (D.C. Ala. 1962). *268 In directing his attention to the scope of repairs, petitioner argues that the repair work actually completed has not brought the house back to its pre-flood condition. In December 1972 petitioner had a structural engineer, Mr. William Lefkovsky ("Lefkovsky"), investigate the house for structural defects. After his investigation, Lefkovsky recommended that the roof be partially reinsulated, rewaterproofed, and reroofed. He also recommended that the surface flooring and interior and exterior wall surfacing be removed at certain points to permit inspection of the floor joists and the stud wall. He lastly recommended that the basement be rewaterproofed and portions of the basement walls be further buttressed. Many of Lefkovsky's recommendations were contingent upon the degree of actual damage which the initial repair and exploratory work would reveal. Petitioner's uncle, on March 22, 1973, submitted to petitioner a $32,000 estimate of the cost of the exploratory work and initial repairs recommended by Lefkovsky. None of this work was ever done. After reviewing this evidence carefully, we conclude that the repair work actually completed did bring the house back substantially *269 to its pre-flood condition. We note that respondent's expert witness possessed an engineering background, was thoroughly credible, and disagreed completely with each of Lefkovsky's recommendations. We also note that, as to the roof, Lefkovsky conceded that it would be necessary to view the underside of a roof to judge its condition but that he did not use the crawlspace to make that observation. Furthermore, the original roof on this house had been replaced in 1965, after only seven years of use. Petitioner has failed to establish that the leaks were the consequence of the flood rather than some flaw in the original construction or the effects of ordinary deterioration. James M. Kemper,30 T.C. 546, 549 (1958), affd. 269 F. 2d 184 (8th Cir. 1959). Petitioner thus failed to establish either the existence of damage to the roof or the connection between the damage, if any, and the 1968 flood. Concerning the alleged structural damage to the floors and walls, we find Lefkovsky's recommendations as to exploratory work to be based too heavily upon unverified speculation about the likelihood of damage. Petitioner has failed in his burden of establishing *270 the existence of flood-caused structural damage. Petitioner's case in relation to damage to the basement fails for similar reasons. First, petitioner has not established by a preponderance of the evidence the existence of structural damage to the basement. His credible expert witness was met by respondent's equally credible expert witness. Further, petitioner has failed to establish the connection between the flood and the subsequent cracks in the basement. James M. Kemper,supra.Three explanations are consistent with Lefkovsky's observations of basement cracks in December, 1972. First, the cracks could have developed soon after the original construction of the house, although petitioner's wife denies such was the case; second, the cracks could have developed over time through the ordinary action of underground water pressure, a particularly potent force given the location and drainage problems of this house; third, the cracks could have developed as a consequence of the flood. Petitioner has not persuaded us that the explanation most favorable to his cause, the third one, is the correct explanation. We note that respondent's expert, who is also an engineer, *271 disagreed with Lefkovsky as to the conclusion to be drawn from the cracks. Even if we were satisfied as to the cause of the alleged structural damage, petitioner has failed to establish the probable cost of repair. The record includes only a $32,000 estimate from petitioner's uncle of the cost of doing the recommended initial repairs and the additional exploratory work. Petitioner has never had any of this exploratory work done and thus has no estimates of the cost of repairs, if any, which might be needed to restore the house to its prior physical condition. We therefore conclude that, even if we adopted the hybrid approach to calculating fair market value, petitioner still has failed in his burden of proof. Petitioner fares no better if we apply the second method in the regulations, the cost of repairs method. He has not met the first requirement of the regulations, namely, that the post-casualty work restore but not improve the property. We have found that the addition of the pilasters in the basement was a significant improvement. Furthermore, he has failed to establish adequately the amount he spent on repairs. Although petitioner submitted a total of $32,583.48 in checks *272 which he had drawn on his separate checking account purportedly to pay for repair work, many checks were made payable to petitioner's wife and to other payees whose relationship to repairs petitioner has failed to demonstrate. Additionally, petitioner indicated that all post-flood work was paid out of this separate checking account. Since this post-flood work included the installation of the pilasters, petitioner's purported total for repair costs must include the funds spent on the pilasters.There is nothing in the record from which we could calculate the portion of petitioner's total which went to the pilasters. The evidence is equally sparse concerning the construction of petitioner's new swimming pool in 1971. We do not know its dimensions, accessories, or support facilities, and therefore do not know whether the new pool was a replacement or an improvement over the pool damaged in the flood. Thus we are unable to accept petitioner's figure for costs of repairs. Even if we were to estimate the cost of repairs, we would not find them to exceed the $25,000 already found to represent the decline in fair market value. We must next consider the loss which petitioner sustained to *273 the personal property located in his basement at the time of the flood. At some point after the flood, petitioner, his wife, and a domestic employee compiled a list of this flood-damaged personal property. On the list petitioner indicated only the name of the item and its value immediately prior to the flood.Petitioner's loss, as indicated on this list, totaled $5,918. Petitioner did not indicate on the list the date of purchase, original cost, or salvage value of the items after the flood. It is well settled that the casualty loss to personal property is computed separately from losses to land, buildings, or improvements. Edmund W. Cornelius,56 T.C. 976, 979 (1971); S. P. Keith, Jr.,52 T.C. 41, 49 (1969); I. Hal Millsap, Jr.,46 T.C. 751, 761 (1966), affd. 387 F. 2d 420 (8th Cir. 1969). It is also clear that the formula to be used in computing the loss on personal property is pre-flood fair market value of the property less post-flood fair market value, with the adjusted basis of the property being the ceiling of recovery. Cornelius,supra at 979; Millsap,supra at 761. *274 The determination of these values is a question of fact. Cornelius,supra at 979. Petitioner failed to establish the pre-flood and post-flood values of personal property damaged or lost in the flood. As to pre-flood fair market value, he failed to show the date of purchase of any of the items, their original cost, and the depreciation factor which he employed to come to his conclusion as to value. As to post-flood fair market value, petitioner failed to indicate whether he sold any of the items, retained any of them for personal use, or simply disposed of them. Although we find it unlikely that the flood-damaged items retained significant value, we find it equally unlikely, in the absence of proof, that not a single item could be salvaged from so extensive a list of articles. Section 1.165-1(c)(4), Income Tax Regs. We also note that petitioner's estimate of personal property loss ($5,918) is significantly higher than his appraiser's ($4,000), and this discrepancy was not explained. In our view petitioner's evidence of flood damage to personal property is too vague and uncertain to establish their fair market value before and after the flood, and his *275 basis in them. However, we are persuaded that he did suffer a significant loss. Under these circumstances we estimate the amount of the loss at $2,500. Cohan v. Commissioner,39 F. 2d 540 (2d Cir. 1930).
Decision will be entered under Rule 155.* Footnotes
1. All section references are to the Internal Revenue Code of 1954, as in effect during the year in issue.↩