JOHN R. PFALZGRAF, JR., AND DESIREE R. PFALZGRAF, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1399–75.    Filed February 14, 1977.

■■■■■■■■■■■■■■■■■■■■■■■

*David R. Pfalzgraf,* for the petitioners.
*Anthony M. Bruce,* for the respondent.

WILBUR, *Judge:* Respondent determined a deficiency in petitioners' Federal income tax in the amount of $2,544.24 for the taxable year 1972. The sole issue for our determination is the amount of loss petitioners sustained when their personal residence caught fire in 1972, which they are entitled to deduct under section 165[1] as a casualty loss.

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioners are John R. Pfalzgraf, Jr., and Desiree R. Pfalzgraf, husband and wife, who resided in Tonawanda, N.Y., at the time the petition was filed in this case. Petitioners filed a joint Federal income tax return for the taxable year 1972 with the North Atlantic Service Center, Andover, Mass.

In 1966, petitioners purchased a home at 104 Calvin Court South, Tonawanda, N.Y., for $17,000. They later added a patio and some minor improvements.

On March 31, 1970, petitioners purchased a homeowners policy from the Home Insurance Co. (hereinafter Home) through Tri-Ton Insurance Agency of Kenmore, N.Y., a local representative of Home. This policy placed the limit of liability at $17,500 on the dwelling and $7,000 on the personal property on the premises. On March 31, 1972, petitioners purchased additional coverage on their existing homeowners policy. The limit of liability on petitioners' dwelling was increased to $20,000 while the limit of liability on the personal property on the premises was increased to $8,000.

On August 20, 1972, petitioners' dwelling at 104 Calvin Court South, Tonawanda, N.Y., was damaged by fire. Shortly after the fire petitioners engaged, on a contingent fee basis, the National Fire Adjustment Co. (hereinafter National Fire) to represent them in determining their loss and recovering

---

[1] All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

from their insurance company. National Fire determined the loss to be as follows:

| | |
|---|---|
| Dwelling.................... | $7,824 |
| Contents.................... | 12,184 |
| Total............. | 20,008 |

This determination was based on an itemized inventory of the damage to the dwelling and contents which was made under the supervision of Frank Papa (hereinafter Papa). Papa viewed the damage on the day after the fire.

Home's representative, Avery R. Smith (hereinafter Smith), viewed the damage within 2 days after the fire. Based on the itemized inventory of the damage prepared by National Fire and on Smith's personal observations, Home computed petitioners' loss as follows:

| | |
|---|---|
| Dwelling.................... | $4,467 |
| Contents.................... | 6,060 |
| Total............. | 10,527 |

Petitioners ultimately settled their claim for this amount as to the damage done to the dwelling and contents.[2] The decision to settle was made after consultation with their agent, Papa, who was an attorney and president of National Fire. Petitioners protested once directly to Smith that the amount offered was too low, but they finally chose to settle without litigation and without exercising their right of appraisal under the contract.

Petitioners repaired the home to essentially the same state it was in prior to the fire. Sometime after the repairs were completed, the home was sold for $28,000.

On their joint income tax return for 1972, petitioners claimed a casualty loss deduction of $10,095 under section 165. Respondent, in a statutory notice of deficiency, disallowed all of petitioners' claimed casualty loss deduction.

---

[2] In addition to the $10,527 for damage done to the dwelling and contents, petitioners received $3,476. Apparently approximately $1,365 of this amount constituted reimbursement for living expenses excluded from gross income under sec. 123, and the remainder compensated them for damage caused to fine arts. Since petitioners have not sought to increase their deduction because of these items and respondent has not sought to decrease petitioners' deduction by these insurance proceeds, we will not discuss them further.

OPINION

The sole issue before this Court is the amount of loss petitioners sustained when their personal residence caught fire in 1972 which is deductible under section 165. Petitioners claimed on their 1972 Federal income tax return to have suffered a loss to their home and its contents of $10,095 in excess of insurance reimbursement, while respondent denies that petitioners have suffered any uncompensated loss. At trial, petitioners amended their petition to claim a refund based on a deduction in excess of that originally claimed. This was done with respondent's agreement and with the Court's permission. See sec. 6512.

Section 165(c) permits individuals to deduct losses suffered on the destruction of nonbusiness property by reason of fire, storm, or other casualty to the extent that the loss from each casualty exceeds $100 and is not compensated for by insurance or otherwise. The proper measure of the loss sustained is the difference in the fair market value of the property immediately prior to the casualty, and its fair market value immediately thereafter, but not exceeding its adjusted basis. *Helvering v. Owens,* 305 U.S. 468 (1939); *Edmund W. Cornelius,* 56 T.C. 976 (1971); *I. Hal Millsap, Jr.,* 46 T.C. 751 (1966), affd. on other issues 387 F.2d 420 (8th Cir. 1968); *Louis Broido,* 36 T.C. 786 (1961); sec. 1.165–7(b)(1), Income Tax Regs. Fair market value may be ascertained either by "competent appraisal" or by proof of the cost of repairs. Sec. 1.165–7(a)(2), Income Tax Regs. Since it is agreed that the fire occurred and caused damage, the only issue we must decide is whether petitioners' loss exceeds the amount of the insurance reimbursement. Petitioners have the burden of proof on this issue. Rule 142, Tax Court Rules of Practice and Procedure. We consider first the house and then the contents.

### Loss Claimed on House

Petitioners established their basis in the real property when they testified that the home cost them $17,000 in 1966.[3] See sec. 1012. Since the maximum loss they claim on their home is

---

[3] The maximum loss on the house petitioners claim is $14,508.92 (less the insurance reimbursement of $4467).

less than their $17,000, basis is not a limiting factor in the present context.

Mr. Papa, of National Fire, who represented petitioners in recovering their loss from the Home Insurance Co., estimated repair costs to the dwelling at $7824. Mr. Smith, of the Home Insurance Co., disagreed with Mr. Papa's estimates, and Home paid $4467 for the cost of repairs to the house to return it to its prefire condition. When petitioners originally filed their return, they based the claimed casualty loss deduction for the house on the report of Mr. Papa, in effect deducting the difference between Mr. Papa's estimate ($7824) and Mr. Smith's ($4467). For the following reasons, we believe that petitioners' loss on the house amounted to the $4467 settlement figure given by Mr. Smith.

Mr. Papa's detailed report estimated the cost of repairing the damage to return the house to its prefire condition. Mr. Smith, on behalf of Home Insurance, also examined the property immediately after the fire and carefully reviewed Mr. Papa's report. Mr. Papa's report claimed that it would cost $7824 to repair the property. Mr. Smith suggested several changes in Mr. Papa's report, concluding that $4467 would be adequate to return the property to its prefire status. The claim was eventually settled for $4467.

We had an opportunity to carefully observe both Mr. Papa and Mr. Smith during their testimony at the trial. We have subsequently carefully reviewed the testimony and examined all of the documentary evidence in detail. We believe that Mr. Smith's analysis was correct. He exhibited a very precise knowledge of the costs of both the material and labor relevant to the required repairs. We were also impressed that he made every effort to fairly evaluate the claim. In several instances, he pointed to changes that were required in Mr. Papa's estimates because of inflated labor costs, because of duplication, or because items that were scheduled for replacement could be repaired. We were left with the conviction that in some cases, Mr. Papa may have inadvertently overestimated the extent of the damage, the magnitude of the repairs required, or the costs involved. We therefore hold that petitioners were compensated for the costs of repairing their home to return it to virtually the identical prefire status.

At the time this case was called from the calendar for trial, petitioners stated that they had, just a few days earlier, ordered a new "economic" valuation report prepared by a Mr. Nye, who subsequently appeared and testified as to his report, which was introduced into evidence. Mr. Nye testified that he had not seen the house prior to the fire and had not been through it since. His knowledge of the damage was confined solely to the pictures taken immediately after the fire and introduced into evidence. He readily conceded that there were no comparable sales of fire-damaged homes in the "market." He also conceded that if the property was repaired to its prefire status (as it in fact was), the fair market value would be exactly the same before the fire and after the postfire repairs.

Mr. Nye's "economic" approach assumed that the burned-out home could only be sold to a contractor or to an individual who would expect to be well compensated for assuming the aggravations involved. His theoretical calculations were based on the assumption that a contractor or individual interested in purchasing the home in its burned-out status immediately after the fire would expect to receive a return based on the following calculations:

| *Contractor as purchaser* | |
| --- | --- |
| Repair cost............................................... | $7,764.00 |
| Cost of invested capital during repair... | 601.16 |
| Taxes accruing before sale ..................... | 294.76 |
| Fees and permits....................................... | 282.00 |
| Sales costs (broker's fees, etc.)............... | 1,967.00 |
| Contractor's profit.................................... | 3,600.00 |
| Total............................................... | 14,508.92 |
| *Individual purchaser* | |
| Repair cost............................................... | $7,764.00 |
| Cost of invested capital........................... | 370.58 |
| Taxes during construction....................... | 196.51 |
| Living expenses during construction..... | 1,200.00 |
| Building permit......................................... | 26.00 |
| General contractor................................... | 1,164.60 |
| Purchaser's loss of time during construction........................................... | 1,941.00 |
| Total............................................... | 12,662.69 |

We believe any homeowner would repair the home himself rather than dispose of the home in its burned-out condition, since (as Mr. Nye conceded) there is no market for a burned-out home. This is in fact what petitioners did, and its value

and appearance after the repairs were the same as before the fire. The cost of these repairs was based on the assumption that the firms doing the repairs would make a profit in accordance with market rates for such services. Petitioners were paid the cost of repairs and it is on these facts rather than on abstract theory and attenuated hypotheses that the determination of the loss must be based.

Even if petitioners' method were valid, Mr. Nye's calculations suffer from severe deficiencies. It is inappropriate to decrease the value of the property by the sales costs (including brokers' commissions) incident to the hypothetical sale, since these would be incurred only pursuant to and as a result of an actual sale, and would result from the sale of the property and not the fire. Section 165 only permits deductions for losses caused by the casualty. Furthermore these expenses would also have been incurred if the undamaged home were sold, and were incurred when petitioners subsequently sold their home sometime after repairing it.

The deduction of property taxes would similarly be inappropriate because the payment of such taxes was not caused by the fire and would have been incurred had the property not burned. We note also that petitioners have already taken a deduction under section 164 for such taxes actually paid, and the hypothetical sales method of measuring the loss would give it to them again.

It would be equally inappropriate to consider the purchaser's living expenses during the repair period. Casualties like fire frequently cause increased living expenses due to temporary homelessness, but we have repeatedly held that such are not casualty losses under section 165. *Millsap v. Commissioner,* 387 F.2d 420 (8th Cir. 1968), affg. 46 T.C. 751 (1966); *Edmund W. Cornelius,* 56 T.C. 976 (1971); *Neil F. McCabe,* 54 T.C. 1745 (1970). Contra *Conner v. United States,* 439 F.2d 974 (5th Cir. 1971). Since petitioners would not be allowed to claim their own additional living expenses as a casualty loss, they would not be able to deduct them by shifting the burden to a hypothetical purchaser. We also note that petitioners received insurance compensation as reimbursement for the extra living expenses they encountered due to the fire. The reimbursement was excludable from gross income under section 123. We find it inconsistent to permit as

a casualty loss deduction the extra living expenses for a homeowner caused by the house being temporarily unlivable, while at the same time the petitioners here received essentially tax-free insurance compensation for such expenses.

Nye included a figure equal to 25 percent of the repair cost to compensate the individual purchaser for his time in securing and consulting with the contractor, approving and inspecting installation, and so forth. Nye never explained the rationale behind this cost, the amount of time it would entail, or how he arrived at the figures used to compute the expense (which averages out to $121 per week for the 4-month period). Nye also computed an 18-percent contractor profit margin which, since he estimated that the entire transaction would take 6 months, amounts to an effective 36-percent-per-year profit level.

In summary, we find petitioners' reliance on Mr. Nye's approach to be wholly without merit, both in concept and application. On brief petitioners state that: "The Court should note that Mr. Nye's figure of $1,941.00 to compensate the individual purchaser for his *aggravation* in rebuilding a burnt-out house on his own is reasonable." (Emphasis added.) We sympathize with the emotional distress the fire surely caused petitioners. But we do not know how to value aggravation and see no need to do so, since it is surely not part of a casualty loss.

### Contents of Home

With respect to the *contents* of the home, we are again faced with differing testimony from Papa and Smith. In estimating the loss to the contents Papa first estimated what he considered to be the cost of obtaining a replacement of like kind and quality for the damaged contents. He next determined the "sound value" of each item which reflects the depreciated value as of the time of the fire. Finally, he determined as the loss the diminution in fair market value attributable to the fire. When the item was completely destroyed the loss equaled the sound value (replacement cost less depreciation); when the item could be cleaned or repaired, the cost of cleaning or repairing constituted the loss. Papa determined the total loss on the contents, including sales tax

and including $125 for debris removal, at $12,184. Papa's method of valuation is generally consistent with the method of determining casualty loss deductions which we found acceptable in *Edmund W. Cornelius*, 56 T.C. 976 (1971). In *Cornelius*, we stated:

> Within the statutory context of section 165 and within the scope of *Helvering* v. *Owens, supra,* we view the term "fair market value" under these particular circumstances as being the cost of the household contents less their depreciation in value.
>
> * * * The value of destroyed property must be ascertained in a reasonable way, and not by attempting to show, as respondent has done through his "expert" witness, what the personal property would have brought if hawked off by a secondhand dealer or at a forced sale. * * * [56 T.C. at 979–980.]

Respondent on brief again expresses some concern that there are no records establishing the dates of acquisition, the cost, and the prefire and postfire fair market value of the various items of personal property destroyed. We find respondent's concern unrealistic in the extreme. No one keeps double ledger accounts on socks, shoes, underwear, or the many other small purchases that comprise the personal property of a household. Even if they had such records, they would often be destroyed in the fire. Additionally, no one should be surprised that there are no bluebook values for a burned bonnet, or that willing buyers and sellers of a charred couch are nowhere to be found.

Both petitioners' expert (Mr. Papa) and respondent's expert (Mr. Smith of Home Insurance Co.) used the same methodology in computing the loss on the personal property. The methodology is apparently generally employed by experts in the field. We believe it is compatible with the applicable regulations.[4]

---

[4] See sec. 1.165–7, Income Tax Regs. It could be argued that, due to inflation, replacement costs will generally be higher than the actual acquisition costs. But replacement value (less depreciation) is the appropriate measure to determine diminution in value as a result of the fire and this is the measure of the loss. It is true that petitioners' actual costs would be relevant to determining basis in the personal property damaged and that the loss (diminution in value) cannot exceed basis. However, we are confident that petitioners' basis in the damaged personal property equaled or exceeded the diminution in value, and respondent does not really contend otherwise.

While Papa placed the damage to the contents at $12,184, Smith's valuation of the damage was less than half this amount—$6,060. In part this stems from Smith's opinion that several articles of clothing could be laundered and cleaned which Papa believed would have to be replaced. After considering all of the evidence, we believe that Papa was correct on this point.[5] Nevertheless, we feel that many of Papa's figures were inflated, possibly for negotiation purposes. Many items are included in the sound value (depreciated) column at the same prices as listed in the replacement cost column, although it was apparent that the items were not new and had been purchased some time before the fire.

It is not easy to umpire a dispute over fire damage to used sheets, bedspreads, ties, umbrellas, etc., that we have never seen, and the task has been made no easier by the unyielding adherence by the parties to positions hardly describable as unassailable. Nevertheless, after a careful review of the evidence, we find the total loss on the contents to be $7,500. This figure includes items which were not discovered until after Papa made his valuation, and accounts for the sales tax which Papa included in his valuation of the loss. State sales taxes are deductible when incurred under section 164(a)(4), and to allow them under section 165 would create an improper double deduction. Petitioner is entitled to a casualty loss of $7,500 less the insurance reimbursement he received on the contents of the house (and less, of course, the applicable $100 deduction prescribed by section 165(c)(3)).

*Decision will be entered under Rule 155.*

---

[5] Testimony established that clothes in rooms near the fire suffered smoke and water damage and, further, that synthetics are especially sensitive to heat and are easily damaged. Judging from the pictures of nearby rooms and the damage the heat did, as well as the testimony of both experts, we find Papa's judgment the more accurate on this point.