T.C. Memo. 1996-215


UNITED STATES TAX COURT


BARBARA ANN TUDYMAN, Petitioner <u>v</u>. COMMISSIONER OF
INTERNAL REVENUE, Respondent


Docket No. 9883-93.                          Filed May 2, 1996.


<u>Sandra G. Scott</u> and <u>Stephen M. Moskowitz</u>, for petitioner.

<u>Margaret S. Rigg</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


COLVIN, <u>Judge</u>:  Respondent determined deficiencies in
petitioner's Federal income tax and additions to tax as follows:

| | | Additions to Tax | | Accuracy-Related Penalty |
|---|---|---|---|---|
| Year | Deficiency | Sec. 6653(a)[1] | Sec. 6661 | Sec. 6662[2] |
| 1985 | $10,985 | $549 | $2,746 | -- |
| 1986 | 8,076 | 404 | 2,019 | -- |
| 1987 | 13,083 | 654 | 3,271 | -- |
| 1988 | 1,961 | 98 | -- | -- |
| 1989 | 3,406 | -- | -- | $578 |

[1] Respondent determined that petitioner is liable for additions to tax for 1986 and 1987 under sec. 6653(a)(1)(A) and (B).

[2] Respondent determined that petitioner is liable for negligence under sec. 6662(a), not substantial understatement or valuation misstatement. See sec. 6662(b), (c), (d), and (e). Thus, we do not consider whether petitioner is liable under sec. 6662(d) or (e).

The issues for decision are:

1. Whether petitioner had a deductible casualty loss of $270,265 from the Loma Prieta earthquake in 1989 as petitioner contends, zero as respondent contends, or some other amount. We hold that her deductible casualty loss was $108,000 for 1988, after reducing the amount of her loss by an insurance reimbursement of $42,000.

2. Whether petitioner is liable for: (a) Additions to tax for negligence under section 6653(a) for 1985 to 1988, (b) additions to tax for substantial understatement under section 6661 for 1985 to 1987, and (c) the accuracy-related penalty under section 6662 for 1989. We hold that she is not.

Section references are to the Internal Revenue Code in effect for the years in issue. Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

A.   Petitioner

Petitioner resided in San Carlos, California, when she filed her petition.  She is a special education teacher for San Mateo County.  She has taken no tax or accounting courses.

B.   Petitioner's Home

Petitioner bought her home at 11 Buttercup Lane, San Carlos, California, on November 4, 1988, for $324,000.  Petitioner's unit is one of 277 condominiums in Crestview Park.  Petitioner is a member of the Crestview Park Condominium Homeowners' Association (Homeowners' Association).

Petitioner's home was built in 1982.  It is the center of three attached units.  She owns one-third of the building, including the roof, the foundation, and the supporting walls. Petitioner owns:  (1) The interior of her unit; (2) an undivided one-third interest in the common areas, such as outside perimeter walls, balconies, bearing walls, subfloors, unfinished floors, pipes, plumbing, wires, and other utilities except the outlets thereof in each unit; and (3) a membership in the Homeowners' Association which owns the pool, tennis courts, and recreation room.

Petitioner insures her home with the USAA Casualty Insurance Co. (USAA).

The Homeowners' Association is responsible for repairing, maintaining, and insuring the common areas, including individual units from the interior paint out.  If proceeds from the Homeowners' Association insurance policy are insufficient to repair damage, the Homeowners' Association may use its own funds or specially assess its members.  The Homeowners' Association was short on funds in 1989 and 1990.

Before she bought her home, petitioner contracted with J.D. Hise (Hise) to inspect it.  Hise is a licensed general contractor who inspected homes for home buyers.  He has worked in the building industry since 1963.  Hise inspected the property on October 25, 1988.  At that time, the foundation had no cracks, the floors were level, the doors fit, 25 roof tiles were broken, the garage slab had minor cracks, the master bath carpet had water damage, the master bath vanity had settled away from the tile splash, and the living room windows leaked.  Hise recommended no structural repairs for the house.

C.    The Loma Prieta Earthquake

The Loma Prieta earthquake (the earthquake) occurred on October 17, 1989.  Petitioner was at home during the earthquake. The earthquake damaged petitioner's home and personal property. During the earthquake, petitioner's house shook, articles fell from the wall and cabinets, tile cracked, and the front door sprang open and would not reclose.  The earthquake measured 7.1 on the Richter scale.  The earthquake area, including the area

where petitioner lived, was declared a national disaster area.
Notice 89-108, 1989-2 C.B. 445.

Petitioner continued to live in her home after the earthquake.

D.    Structural Damage

1.    The Foundation

a.    Description

Each of the three units in petitioner's building has a garage. Petitioner's garage is built on flat land. Part of the foundation of each unit is separate from the garage on a steep slope. Petitioner's unit has a pier and grade beam foundation other than for the garage. The grade beams rest on piers. The piers are 18 inches in diameter and 18 feet deep.

The foundation of petitioner's home was weakened by the earthquake. The earthquake caused about 25 cracks in the foundation, including several under the main supports for the house.

b.    Inspection by Bob Cook

Shortly after the earthquake, petitioner hired a contractor, Bob Cook (Cook), to inspect her home. Cook made two estimates of the cost of structural repairs to petitioner's home. He made a preliminary estimate on December 5, 1989, of $37,900, and a final estimate on December 20, 1989, of $48,100. Cook had engineers consider whether the foundation needed to be replaced or could be salvaged using chemical adhesive injection (i.e., epoxy). On

December 5, 1989, he estimated that replacing the foundation would cost from $90,000 to $130,000, and that chemical adhesive injection would cost about $30,000. On December 20, 1989, Cook estimated that foundation repairs would cost from $30,000 to $150,000. Petitioner submitted Cook's estimate to USAA.

c. Construction Management Associates and Frank Lewis

The Homeowners' Association hired Construction Management Associates (CMA) to oversee the repair of damage caused by the earthquake. Frank Lewis (Lewis) worked for CMA. Lewis is a civil engineer and a land surveyor. He has extensive knowledge of earthquake damage. He examined 40 to 50 homes damaged by the Loma Prieta earthquake.

Lewis first inspected petitioner's unit on December 8, 1989. He investigated whether the house was safe after the earthquake. At trial, he said that a foundation has serious problems if it has 20 or more cracks. He said that the foundation for petitioner's home had 4 cracks wider than three thirty-seconds of an inch (about the width of a nickel), and at least 25 hairline cracks. On February 5, 1990, he said that the earthquake caused petitioner's home to appear to be rotating off its foundation.

Graham & Kellam were structural engineers who reviewed the structural adequacy of the Crestview Park units for CMA in 1990. After inspecting petitioner's home with Lewis on April 19, 1990, Leslie Graham (Graham) of Graham & Kellam said that the foundation was stable.

After further inspection in April 1990, Lewis said that the foundation was sound. He recommended that the Homeowners' Association inject epoxy into the large cracks in petitioner's foundation. The hairline cracks were too small to inject.

### d. Philip Barrett

Petitioner hired a contractor, Philip Barrett (Barrett), to repair her home shortly after the earthquake. Barrett remodeled petitioner's bathrooms, fixed the living room fireplace, and rehung several doors that were out of plumb. He saw stress cracks and apparent movement in the foundation.

### e. Gary Halpin

Petitioner hired Gary Halpin (Halpin) to estimate the value of her home after the earthquake. Halpin inspected many buildings damaged by the Loma Prieta earthquake. Halpin first saw petitioner's unit on August 25, 1994, nearly 5 years after the earthquake. He also inspected her unit on November 20, 1994.

Halpin thought that there were too many cracks to be repaired with epoxy injection. Halpin concluded that the foundation should be replaced to restore it to its pre-earthquake condition.

### f. Foundation Repairs

In November 1990, the Homeowners' Association hired Hensley Homes (Hensley) to retrofit the foundation of petitioner's home

(to bring the foundation into compliance with the building code) and do drainage work for petitioner's home. The contract was for $7,381. Hensley injected epoxy in the foundation and installed plywood shear walls in the crawl space under petitioner's home. Hensley also added studs, shearwall, and tie-downs to the foundation of petitioner's unit. Petitioner did not have any other foundation repairs done.

2. The Roof

The roof of petitioner's home was defective when petitioner bought the unit. The earthquake did not damage the roof.

At the time of the earthquake, the Homeowners' Association was involved in litigation with the developers of Crestview Park. The Homeowners' Association alleged that construction was substandard. In 1992, the developers and the Homeowners' Association agreed to a settlement for faulty roof design. The Homeowners' Association repaired the roofs on the three units in petitioner's building for about $7,500.

3. The Garage

The crack in petitioner's garage floor was larger after the earthquake than when petitioner bought her home, and it was heaving. Cook estimated that it would cost $8,000 to replace the garage floor.

4. Floors

The earthquake caused the first and second floors of petitioner's home not to be level. On April 19, 1990, Graham

observed that the first and second floors of petitioner's home were not level.

In 1990, petitioner hired Jack Santangelo (Santangelo) to install marble tile in the entryway, master bathroom, fireplace, upstairs bathroom vanity, bar in the den, and dining room, and on the stairs from the living room to the dining room. He leveled the floors where he installed new tile. The marble tile he installed cost a few hundred dollars more than the tile that was there previously. The only areas that are level are those that Santangelo leveled: The entryway, the dining room, the stairs to the living room and den, the downstairs half bath, and the upstairs second bath and master bath.

Halpin and Lewis recommended that petitioner's unit be jacked up to level the floors. Halpin also recommended that the roof be renailed to prevent stress in the roof line. However, jacking up the building could cause several problems and might not result in restoring petitioner's home to its pre-earthquake condition. Jacking up the middle unit could damage the connections at the party walls and at the roof line. Jacking up the building would force the plumb components (such as the second floor walls) out of plumb. Finally, jacking up the unit would put the part of the first floor that Santangelo had already leveled out of level. Petitioner wanted a guaranty that the work would not damage her marble tile. The Homeowners' Association would not make that guaranty.

5. <u>Doors</u>

The doors to the hallway closet and the master bath were out of plumb and did not hang properly after the earthquake. Barrett rehung them and used better quality hardware. Other doors did not stay open and some stuck. Petitioner replaced several doors after the earthquake.

6. <u>The Fireplace and Chimney</u>

The earthquake caused the fireplace mantle to separate from the wall. Some stucco cracked and fell from the chimney and had to be patched.

7. <u>Kitchen Floor/Linoleum</u>

The earthquake caused a bump in the linoleum on the kitchen floor. Petitioner has not replaced the linoleum.

8. <u>Other Structural Damage</u>

There were cracks in the plaster in areas not specified in the record. The bathroom tile cracked at the tile splash. Grout joints separated from the tub, vanities, and floors. Tiles in the entryway cracked, and some did not adhere to the floor after the earthquake. The stairs were not level, and the stair railings were loose. An upstairs toilet cracked. An upstairs bathroom (not the master bath) carpet, not reported by Hise as damaged when he inspected petitioner's house before the earthquake, was damaged by water which splashed from the toilet during the earthquake.

9. <u>Halpin's Estimate of Damages to Petitioner's Residence</u>

Halpin estimated the casualty loss to petitioner's home by comparing its fair market value before and after the earthquake. He concluded that the fair market value of petitioner's home was $324,000 before and $116,700 after the earthquake, for a $207,300 loss in value. He estimated the loss in value by considering the cost of restoring petitioner's home to its pre-earthquake condition.

Halpin estimated that it would cost $157,364.02 to restore petitioner's home to its pre-earthquake condition. He estimated that it would cost $50,000 for a pier foundation retrofit required by the 1988 State building code. There was an existing pier foundation, but the earthquake made it inadequate.

Halpin estimated the cost of repairs as follows:

General Items

| | |
|---|---|
| Project management | $7,340.10 |
| Progressive/postconstruction cleanup | 2,264.80 |
| Architectural/engineering services | 3,500.00 |
| Soils report/engineering | 2,250.00 |
| General labor (materials and equipment handling) | 4,320.00 |
| Interior/exterior scaffolding | 2,050.00 |
| Content move-out/packing | 4,250.00 |
| Content move-back/unpacking | 4,250.00 |
| Content storage | 250.00 |
| Permit fees | 665.00 |
| Detach/reset window treatment for all rooms | 445.00 |
| General repair allowance (e.g., rafters, joists) | 1,100.00 |
| Subtotal | 32,684.90 |

Other Items

| | | |
|---|---|---|
| Substructure | 51,498.40 | |
| Garage | 5,146.35 | |
| Kitchen | 2,767.46 | |
| Dining room | 957.22 | |
| Entry | 3,215.24 | |
| Hall bath | 1,347.19 | |
| Living room | 4,134.28 | |
| Den | 1,671.98 | |
| Stairways | 1,208.28 | |
| Bath #2 | 2,966.21 | |
| Bedroom #2 | 1,478.35 | |
| Master bedroom | 2,398.68 | |
| Master bath | 4,328.13 | |
| Front elevation | 1,500.00 | |
| Rear elevation | 1,425.00 | |
| Roof | 7,163.55 | |
| Subtotal | | 125,891.22 |
| | | |
| Overhead @ 10% | 12,589.12 | |
| Profit @ 10% | 12,589.12 | |
| Contingency @ 5% | 6,294.56 | |
| Total cost of repairs | | 157,364.02 |
| | | |
| Retrofit | 50,000.00 | |
| Total diminution in value | | 207,364.02 |

E.    Personal Property Damage

The earthquake destroyed or damaged personal property in petitioner's home, such as rugs, mirrors, and a chandelier in the entryway; the fireplace mantle and mirrors in the living room; vases, china, crystal, and a chandelier in the dining room; dishes, glasses, a clock, and some appliances in the kitchen; books, vases, a clock, and a statue in the den; a mirror and figurines in the bedroom; clocks, pictures, and stained glass in the bathrooms; and clothing and various other personal items.

Petitioner inventoried and estimated the value of her damaged personal property shortly after the earthquake. Petitioner's accountant, Robert Kern, gave her an Internal Revenue Service worksheet to complete before he prepared her amended 1988 return. On the worksheet, petitioner estimated the cost and fair market value of her damaged personal property items. She spent 50 to 100 hours researching the cost and fair market value of the damaged items. She called stores to get the cost of items for which she did not have receipts.

The earthquake destroyed some of petitioner's personal property, such as mirrors, statues, vases, and figurines. It damaged other items such as bookcases, tables, chairs, a grandfather clock, rugs, and appliances. Petitioner had to have some of the damaged items repaired. For example, petitioner had the buffet server, table, and chairs repaired.

Petitioner asked an appraiser, Mervyn Cohn (Cohn), to verify the cost and fair market value of the damaged items. He checked price guides, called retailers, and concluded that petitioner's estimates were reasonable. He discounted the pre-earthquake cost or fair market value by 40 percent. He estimated that the value of petitioner's personal property was $86,398 before the earthquake. He assumed that the personal property listed by petitioner as damaged by the earthquake had no salvage value. He did not separately estimate the salvage value of each item.

Cohn did not see petitioner's personal property or photographs of it. Cohn relied on information from petitioner consisting of an attachment to her tax return, some handwritten schedules, and a few receipts.

Petitioner had received some of the personal property that was damaged by the earthquake as gifts. Her grandmother gave her some leather-bound books, a magazine rack, and some stemware. Petitioner did not establish the donor's basis in any of the gifts. Petitioner inherited some items, including the dining room chandelier and books, from her aunt.

F.    Property Tax Assessment

In January 1990, petitioner applied for a reduction in the property tax assessment of her home because of the earthquake damage. San Mateo County reduced the property tax assessment of her home by $202,200 from $317,000 to $114,800 based on repair estimates by Cook ($150,000 for foundation repair and $47,600 for other structural repairs) and Arbor Electrical ($4,593 for electrical repairs) and a telephone conversation with petitioner's realtor, Clare Box (Box). Box estimated that the value of petitioner's home was $389,000 before the earthquake and $188,057 after the earthquake, for a loss in value of $200,943.

In March 1991, in response to a questionnaire from San Mateo County, petitioner said that the foundation had been reinforced to prevent future damage but that the floors had not been leveled. In March 1993, in response to a questionnaire from San

Mateo County, petitioner said that she had repaired the damage to her property. The County reappraised the property at $350,705.

G.   Petitioner's Insurance Claim

Petitioner was insured for earthquake damage up to $42,000 by USAA. Petitioner submitted a claim to USAA for personal property damage of $59,967.99.

A USAA inspector estimated that petitioner's real property damage was $40,000 to $60,000, which exceeded the $30,000 policy limit. Lentom General, a building contractor, estimated that it would cost $50,000 to $55,000 to jack up the building to level the floors. Lentom General sent its estimate to USAA.

On February 16, 1990, USAA paid $12,000 to petitioner for personal property damage and $30,000 for real property damage caused by the earthquake. This amount ($42,000) was the maximum allowed by her policy.

H.   Homeowners' Association Insurance

The Homeowners' Association insured the condominium complex with Aetna Life & Casualty (Aetna). On April 10, 1990, Aetna denied coverage for the earthquake damage. Aetna concluded that petitioner's damage was less than the deductible (5 percent of the cost of her building). The policy excluded damage to the foundation. Aetna did not consider foundation damage in concluding that the damage was less than the deductible.

I.   Petitioner's Tax Returns

Petitioner timely filed a Federal income tax return for 1988. Petitioner properly elected under section 165(i) to claim a loss deduction in the immediately preceding tax year. She filed an amended 1988 return on April 9, 1990, to claim a casualty loss of $290,262,[1] for the damage caused by the earthquake.

The Homeowners' Association had made minimal repairs to her home when she filed her amended 1988 return. Aetna denied coverage under the Homeowners' Association policy for the earthquake damage to petitioner's home on April 10, 1990.

Petitioner filed amended returns for 1985, 1986, and 1987 on June 6, 1990. She carried back net operating losses of $250,661 to 1985, $208,242 to 1986, and $172,919 to 1987 from the unused 1988 casualty loss. She carried forward $121,814 of the unused casualty loss to 1989.

Petitioner filed her 1989 return around April 15, 1990.

---

[1] Petitioner calculated her casualty loss deduction as follows:

| | | |
|---|---|---|
| Personal property damage | $134,411 | |
| Real property damage | 202,200 | |
| Subtotal | 336,611 | |
| Less: | | |
| Insurance proceeds | | 42,000 |
| Sec. 165(h)(1) limit | | 100 |
| Sec. 165(h)(2) limit | | 4,247 |
| | | 46,347 |
| Casualty loss | | 290,264 |

Petitioner deducted $290,262 as a casualty loss deduction. There is no explanation in the record for the $2 discrepancy.

By notices of deficiency issued on February 19, 1993, respondent disallowed all of petitioner's casualty loss deduction and associated carrybacks and carryforward.

OPINION

A.   Casualty Loss Deduction

1.   Contentions of the Parties

Petitioner argues that she may deduct her losses from the earthquake as a casualty loss.  She contends that she offered evidence showing the difference between the fair market values of her home and personal property before and after the earthquake and the adjusted bases of the property, and that respondent offered no evidence that the earthquake did not cause the damage.

Respondent contends that petitioner has not proven that her losses exceeded the amount of insurance proceeds she received, or that the fair market value of the property was less after the earthquake than before.

As discussed below, we conclude that petitioner's losses were greater than her insurance reimbursement but less than the amount she deducted.

2.   Eligibility for a Casualty Loss Deduction

Individuals generally may deduct losses to property caused by casualties such as earthquakes. Sec. 165(c)(3).  The loss must exceed $100 and 10 percent of the individual's adjusted gross income.  Sec. 165(h)(1) and (2)(A)(ii).  Taxpayers may not

deduct amounts compensated by "insurance or otherwise."  Sec. 165(a).

Taxpayers who suffer disaster losses in an area declared a disaster area by the President may elect to deduct the loss in the tax year immediately preceding the year in which the disaster occurred.  Sec. 165(i)(1).

To be eligible for a casualty loss deduction based on the decrease in the fair market value, petitioner must prove:  (a) The fair market value of the property immediately before and immediately after the earthquake, (b) the amount of insurance reimbursement, and (c) the adjusted basis in the property. Helvering v. Owens, 305 U.S. 468 (1939); Lamphere v. Commissioner, 70 T.C. 391, 395-396 (1978); Cornelius v. Commissioner, 56 T.C. 976, 979 (1971); sec. 1.165-7(a)(2), Income Tax Regs.[2]

_____

[2] Sec. 1.165-7(a)(2), Income Tax Regs., provides:

   (2)  Method of valuation. (i) In determining the amount of loss deductible under this section, the fair market value of the property immediately before and immediately after the casualty shall generally be ascertained by competent appraisal.  This appraisal must recognize the effects of any general market decline affecting undamaged as well as damaged property which may occur simultaneously with the casualty, in order that any deduction under this section shall be limited to the actual loss resulting from damage to the property.

   (ii)  The cost of repairs to the property damaged is acceptable as evidence of the loss of value if the taxpayer shows that (a) the repairs are necessary to
(continued...)

The cost of repairs may be considered if the taxpayer shows that:  (a) The repairs are necessary to restore the property to its condition immediately before the casualty, (b) the amount spent for the repairs is not excessive, (c) the repairs are made only to the damaged portion of the property, and (d) the repairs do not cause the value of the property to exceed the value of the property immediately before the casualty.  Lamphere v. Commissioner, supra; Farber v. Commissioner, 57 T.C. 714, 719 (1972); sec. 1.165-7(a)(2)(ii), Income Tax Regs.

Respondent's determination is presumed to be correct.  Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

3.    Structural Damage to Petitioner's House

The fair market value of petitioner's house before the earthquake was $324,000, the amount petitioner had paid for it about 11 months earlier.

The parties each called expert witnesses to give their opinions about the structural damage to petitioner's house caused by the earthquake.  Expert witnesses' opinions can help the Court to understand subjects requiring specialized training, knowledge, or judgment.  However, the Court is not bound by the experts'

---

[2](...continued)
restore the property to its condition immediately before the casualty, (b) the amount spent for such repairs is not excessive, (c) the repairs do not care for more than the damage suffered, and (d) the value of the property after the repairs does not as a result of the repairs exceed the value of the property immediately before the casualty.

opinions. <u>Helvering v. National Grocery Co.</u>, 304 U.S. 282, 295 (1938). We weigh the opinions of expert witnesses according to their qualifications and other relevant evidence. <u>Anderson v. Commissioner</u>, 250 F.2d 242, 249 (5th Cir. 1957), affg. in part and remanding in part T.C. Memo. 1956-178; <u>Johnson v. Commissioner</u>, 85 T.C. 469, 477 (1985).

Respondent's expert, Lewis, gave no opinion about the fair market value of petitioner's house after the earthquake. Petitioner's expert, Halpin, estimated that the postearthquake value was $116,700.

### a. Halpin's Valuation

Halpin inspected petitioner's home on August 25 and November 20, 1994. He reviewed various documents that petitioner gave him, including Cook's December 5, 1989, estimate; memos from CMA to Graham & Kellam; Lewis' written report dated January 31, 1990, describing his findings and recommendations concerning the postearthquake damage to petitioner's home after on-site inspections on December 8, 1989, and January 19, 1990 (Exhibit 12-L); a May 11, 1990, letter from Graham reviewing the condition of petitioner's home; and a November 15, 1990, letter and application from CMA for a permit to retrofit petitioner's home. Halpin prepared a report describing the damages to petitioner's home caused by the earthquake and the repairs needed to restore the house to its pre-earthquake condition. He subtracted his estimate of the cost of repairs and his estimate of the cost of

retrofitting the foundation to get the postearthquake loss in value of petitioner's home.

Respondent argues that Halpin improperly used a cost-of-repair method. We disagree. Halpin valued petitioner's home by comparing its fair market value before and after the earthquake.

An appraiser may consider repair cost estimates in deciding postcasualty fair market value. Pfalzgraf v. Commissioner, 67 T.C. 784, 788 (1977); Abrams v. Commissioner, T.C. Memo. 1981-231. In Abrams, an appraiser used repair estimates to confirm his estimate of postearthquake fair market value, which he based on the market method. In Pfalzgraf, we held that, in estimating the amount of a casualty loss, an appraiser may consider the cost of repairing property to restore it to its precasualty status. 67 T.C. at 788. We rejected the taxpayers' method of estimating their loss based on the difference between the prefire fair market value and the postfire fair market value because the taxpayers' method included losses or expenses not caused by the fire. Id. at 789-791.

Respondent contends that Abrams and Pfalzgraf do not stand for the proposition that repair estimates may be used to calculate a casualty loss. We disagree. The taxpayer's expert in Abrams concluded that a prospective buyer would discount the value of the damaged building by the cost of needed repairs. He subtracted the estimated cost of repairs from the precasualty fair market value. Similarly, Halpin estimated the loss in value

of petitioner's home by subtracting the estimated cost of repairs from its pre-earthquake fair market value.

In Pfalzgraf, we approved an appraiser's estimate of the cost of repairing property as a measure of the taxpayers' casualty loss. 67 T.C. at 788. Here, Halpin figured petitioner's casualty loss by estimating the cost of restoring petitioner's home to its pre-earthquake condition.

Respondent argues that Halpin's testimony should be given little weight because he is not an engineer. We disagree. Halpin was a credible and knowledgeable witness.

Respondent argues that we should give Halpin's report less weight because Halpin first saw petitioner's property 5 years after the earthquake. We agree. We give Halpin's report less weight because some of the property damage could have occurred during those 5 years.

Respondent pointed out that Halpin testified that the second floor was sloped, yet Halpin did not measure the second floor and did not note that it was sloped on his diagram of that floor. In his diagram of the first floor, he noted that it was sloped. We do not think Halpin's failure to measure the second floor is significant. He testified that he could feel the slope by walking across the floor, and that he did not take measurements because it would be expensive to do so and because he thought it was sufficient to measure the first floor. Santangelo testified that he had to level the second floor before he retiled it.

Graham wrote to Lewis on May 11, 1990, that the second floor was out of level.

Respondent argues that the earthquake did not worsen the crack in the concrete garage slab. We disagree. Cook viewed the garage shortly after the earthquake. He concluded that the earthquake worsened the crack in the garage floor and that the garage floor should be replaced.

There are defects in Halpin's valuation. He used 1994 labor and materials cost estimates instead of 1989 costs. He included repairs that may have been required by wear and tear on the property during the 5 years between the earthquake and his survey, such as interior and exterior painting. He estimated that it would cost $50,000 to retrofit the foundation of petitioner's home although the Homeowners' Association had paid Hensley $7,381 in November 1990 to retrofit the foundation of her home. He double-counted a $2,600 estimate to perform certain electrical work in the foundation. He incorrectly included in his estimate $8,750 for petitioner to vacate her unit and store her belongings during repairs. Millsap v. Commissioner, 46 T.C. 751 (1966), affd. 387 F.2d 420 (8th Cir. 1968) (additional living expenses, e.g., moving expenses and temporary accommodations expenses, resulting from a casualty are not deductible as part of a casualty loss).

b.    Respondent's Expert--Frank Lewis

i.    Admissibility of Respondent's Expert's Report

Respondent's expert at trial was Frank Lewis.

Rule 143(f) provides that, unless otherwise permitted by the Court upon timely request, any party who calls an expert witness shall cause that witness to prepare a written report to submit to the Court and the opposing party not later than 30 days before the calendar call.  Rule 143(f)(1).  We will exclude expert witness testimony for failure to comply with the provisions of Rule 143(f) unless the failure is due to good cause, and the failure to comply with the Rule does not unduly prejudice the opposing party.  Id.

The Court granted respondent's request at trial to designate Exhibits 12-L, T (pages 26-27), and Z as Lewis' expert report. Exhibit 12-L is Lewis' report dated January 31, 1990, describing his findings and recommendations concerning the earthquake damage to petitioner's home after inspections on December 8, 1989, and January 19, 1990.  The report includes about 25 photographs of the foundation of petitioner's home.  Pages 26 and 27 of Exhibit T are a letter dated June 13, 1990, from Lewis to Graham & Kellam, recommending that the floors of petitioner's unit be leveled by removing, reconstructing, and stabilizing the pony walls and without jacking up her unit.  Exhibit Z is Lewis' curriculum vitae.

Petitioner contends that we should not have allowed respondent to designate those exhibits as Lewis' expert report because respondent failed to do so 30 days before the calendar call. Petitioner also contends that we should strike Lewis' testimony because respondent listed Lewis in the pretrial memorandum as a fact witness, not as an expert. Petitioner argues that she was prejudiced because Halpin did not fully respond to Lewis' report in his report and because petitioner's counsel could not adequately prepare for cross-examination of Lewis.

We disagree. Petitioner was not prejudiced in any way by the admission into evidence of Lewis' expert report and expert testimony. Halpin referred to and relied on Exhibit 12-L (Lewis' report) in preparing his own expert report. Halpin had Exhibit 12-L and petitioner's counsel had pages 26-27 of Exhibit T several months before trial. Halpin became thoroughly familiar with these items before he testified at trial. Our consideration of the points made by Lewis in those exhibits was identical whether or not we treated the exhibits as Lewis' expert report. Respondent listed Lewis as a fact witness for this trial session and one the year before. His expert testimony directly related to his factual knowledge gained from his investigation of petitioner's residence after the earthquake. Petitioner had every opportunity at trial to have Halpin respond to Lewis'

testimony, and petitioner's counsel used this opportunity effectively. Permitting Lewis to testify as an expert did not prejudice petitioner in any way. Cf. Chagra v. Commissioner, T.C. Memo. 1991-366 (taxpayers' motion to strike expert testimony was granted because taxpayers did not have access to the Commissioner's expert's conclusions and their underlying bases before trial), affd. without published opinion 990 F.2d 1250 (2d Cir. 1993).

Petitioner cites Smith v. Ford Motor Co., 626 F.2d 784 (10th Cir. 1980), in which the U.S. Court of Appeals for the Tenth Circuit concluded that the defendant had been prejudiced by expert testimony. In Smith, the plaintiff failed to provide adequate advance information about proposed testimony of a medical expert witness, and the plaintiff elicited testimony from the witness that was outside the scope of the plaintiff's description of his proposed testimony. Defendant's counsel had only 11 minutes to prepare for cross-examination of the expert witness. Id. at 791 n.3. In contrast, as discussed above, long before trial, petitioner's expert and petitioner's counsel were thoroughly familiar with the items that we treated as Lewis' expert report, and petitioner was not prejudiced by the admission of Lewis' expert testimony or expert report.

### ii. Lewis' Conclusions

Lewis and Graham said that the foundation of petitioner's house was structurally sound and could be repaired by injecting

epoxy into the cracks. Respondent attempts to minimize the fact that Lewis said that the foundation was not sound, that the house appeared to be rolling off its foundation, and that a foundation should be replaced if it has more than 20 cracks. The foundation in petitioner's home had 25 cracks after the earthquake. Petitioner points out that Lewis worked for CMA, which had been retained by the Homeowners' Association. These facts lead us to give Lewis' opinion less weight.

Lewis and Graham said that the first floor of petitioner's home was not level when it was built. We disagree. Hise testified that the floors were level when he inspected the house. Barrett had to rehang several of the doors, which shows that the Graham & Kellam report erred in stating that all of the doors fit and were plumb. Halpin concluded that the earthquake caused petitioner's floors to be out of level. We agree.

Halpin believed that an epoxy injection would be insufficient and that the foundation needed to be replaced. Graham is a structural engineer and is better qualified to evaluate the foundation than Halpin. While Halpin's overall testimony was credible, he is not an engineer and is less knowledgeable about foundations than Graham.

Respondent questions whether Hise did a thorough investigation for his $200 fee. Respondent says that Hise failed to adequately inspect the foundation and report on its condition. Respondent's criticism of Hise is at best speculative.

Respondent did not raise these criticisms when Hise testified at trial and thus did not give Hise a chance to respond to them. Hise is a licensed general contractor. He prepared a detailed report on the condition of petitioner's home. His testimony appeared to be credible. We accept Hise's report as a fair representation of the condition of petitioner's house before the earthquake.

Respondent argues that the fact that petitioner lived in her home after the earthquake but did not repair the foundation shows that she believed that the building was safe. However, respondent has not shown or even argued that a house must be uninhabitable to lose value to the extent that petitioner contends.

### c. Improvements to Petitioner's Home

A taxpayer must show that the repairs do not improve the property more than the damage suffered, and that the value of the property after the repairs does not, as a result of the repairs, exceed the value of the property immediately before the casualty. Sec. 1.165-7(a)(2)(ii), Income Tax Regs. Respondent points out that some of petitioner's expenses were for improvements to her home. For example, petitioner installed marble tile worth a couple of hundred dollars more than the tile that was there previously, and she upgraded some fixtures and door hardware.

d.    Conclusion

We conclude that the earthquake caused the foundation to crack in 25 places and the floors to slope.  We also conclude, based primarily on the Graham & Kellam report, that the foundation of petitioner's home could be repaired.  However, we believe a buyer would pay much less for a home in that condition than he or she would pay for the same property undamaged.  Even though the Homeowners' Association was liable for making some of the repairs, we believe a prospective buyer would pay less for this property than for identical property where no repairs were required because of the possibility that it would take effort to ensure that the work was done.  We conclude that petitioner's home lost $115,000 in value because of the earthquake.

4.    Personal Property

Petitioner's personal property was also damaged by the earthquake.  She deducted $134,411 on her 1988 return for loss to her personal property.  She attached an appendix to her brief showing that she had a personal property loss of $110,065.  We treat the appendix as petitioner's position in this case relating to her personal property loss.

Petitioner compiled a detailed inventory of her personal property that was damaged or destroyed as a result of the earthquake.  She spent 50 to 100 hours researching the cost of the damaged items.  Cohn said that the values petitioner used were reasonable.  Petitioner contends that, although she did not

testify about or have notes on each item on her list, based on her testimony, notes and receipts, and Cohn's testimony, we should conclude that she prepared an honest inventory of her damaged property.

Respondent argues that we should not consider Cohn's appraisal because he did not see petitioner's personal property or photographs of property, and he lacked information about some of the items. We agree in part and disagree in part. Cohn appeared to be knowledgeable, and he readily disclosed the limits inherent in the methodology he used. On the other hand, Cohn lacked necessary information, such as the age, original cost, or pre-earthquake fair market value of some of petitioner's items. He incorrectly assumed that none of the property had salvage value. Cohn did not know the size of or the number of lights in the chandeliers, or the amount of crystal in them. He did not know the height, type, quality, or condition of the grandfather clock. He did not know the size or quality of the antique bells or whether they were made of metal. Cohn valued 20 books at $20 per book without knowing their titles, age, or condition.

Petitioner's estimates of the amount of her personal property damage were flawed in part. She used the wrong year of purchase for a few of the items. The refrigerator, stove, carpeting, and the entrance hall chandelier had all been in the unit since it was built in 1982, yet petitioner listed the date of purchase as 1988, the year she bought the condominium.

Appliances and carpeting are worth much less after 7 years than after 1 year.

For a few items that had lost value before the earthquake, petitioner deducted cost rather than the fair market value. She did not consider depreciation in estimating the precasualty fair market value of her clothes that were damaged.

Petitioner had some items repaired that had been damaged by the earthquake, such as the buffet server and the dining room table and chairs. If a taxpayer has repaired property damaged by a casualty, the cost of repairs may be a better measure of the loss than an appraisal. Clapp v. Commissioner, 321 F.2d 12 (9th Cir. 1963), affg. 36 T.C. 905 (1961); Pfalzgraf v. Commissioner, 67 T.C. at 791; Keith v. Commissioner, 52 T.C. 41, 49 (1969). Petitioner incorrectly used a diminution in value method rather than the actual repair cost to measure her loss for these items.

Petitioner claims that things fell on and scratched her refrigerator and stove. She also claims that heavy things fell on and bent and scratched her knives and forks. We think petitioner overestimated the extent of damage to these items. We are not convinced that the earthquake extensively damaged her refrigerator, oven, blender, electric iron, kitchen sink, ladder, utensils, telephone, rack, and all clocks, or that it destroyed napkins, tablecloths, towels, and a bath mat. We are not convinced that she lost $520 of canned goods, $4,000 of plumbing fixtures, 400 pieces of china, and 122 pieces of stemware.

As discussed at paragraph A-2 above (p. 17), petitioner must prove her adjusted basis in property for which she claims a casualty loss. A taxpayer who acquires property by gift takes a basis in the property equal to the lesser of the donor's basis or the fair market value at the time of the gift. Sec. 1015. A taxpayer who inherits property takes a basis in the property equal to its fair market value at the date of the decedent's death. Sec. 1014(a). Petitioner did not establish the basis she had in property that she received by gift or inheritance. For example, she did not show that the fair market value she provided was determined at the time of the earthquake or at the time of her aunt's death. She said that the chandelier, which she valued at $14,500, was not listed as an asset in her aunt's estate tax return. Petitioner did not show what her basis is for these items.

Petitioner's personal property was damaged by the earthquake, but we think she overestimated the amount of damage. We conclude that petitioner had personal property loss of $35,000.

### 5. Insurance Payment

We conclude that the decrease in fair market value of petitioner's home due to the earthquake exceeded her insurance recovery.

Petitioner received $42,000 ($30,000 plus $12,000) as insurance reimbursement, the maximum allowed under her policy.

As discussed above, petitioner sustained losses of $115,000 to the structure of her home and $35,000 to her personal property. This exceeds her insurance recovery by $108,000.

6.  Year of Loss

    a.  Reasonable Prospect of Recovery

Petitioner may deduct her casualty loss only to the extent it is not compensated by "insurance or otherwise", e.g., by the Homeowners' Association.  Sec. 165(a).  Respondent argues that petitioner did not have an uncompensated loss because the prospects of repair by the Homeowners' Association were very high in 1990 when petitioner filed her amended 1988 return.  Whether there is a reasonable prospect of recovery is decided based on all the facts known in the taxable year.  Coastal Terminals, Inc. v. Commissioner, 25 T.C. 1053 (1956); sec. 1.165-1(d)(2)(i), Income Tax Regs.[3]  Petitioner filed her amended 1988 return

---

[3] Sec. 1.165-1(d)(2)(i), Income Tax Regs., provides:

> If a casualty or other event occurs which may result in a loss and, in the year of such casualty or event, there exists a claim for reimbursement with respect to which there is a reasonable prospect of recovery, no portion of the loss with respect to which reimbursement may be received is sustained, for purposes of section 165, until it can be ascertained with reasonable certainty whether or not such reimbursement will be received.  Whether a reasonable prospect of recovery exists with respect to a claim for reimbursement of a loss is a question of fact to be determined upon an examination of all facts and circumstances.  Whether or not such reimbursement will be received may be ascertained with reasonable certainty, for example, by a settlement of the claim, by an adjudication of the claim, or by abandonment of

(continued...)

shortly before Aetna denied her claim for damage under the Homeowners' Association policy.[4]  Respondent argues that petitioner had a reasonable prospect of recovery when she filed her return because Aetna had not yet denied her claim.  We disagree.  The Homeowners' Association was short on funds in 1990 and had made only minimal repairs to petitioner's home in April 1990 when she filed her amended 1988 return.  It was uncertain whether it could afford to make all of the repairs for which it was responsible.  Notwithstanding the fact that the Homeowners' Association could have specially assessed its members to pay for repairs, there is no evidence that it did so in 1990.[5]  The fact that it could have done so did not give petitioner a reasonable prospect of recovery in 1990.  We conclude that petitioner had losses from the earthquake for which she had no reasonable prospect of recovery from insurance or otherwise and which she properly deducted on her amended 1988 return.

b.    Role of the Homeowners' Association

[3](...continued)
the claim.  * * *

[4] Petitioner contends that she filed her amended 1988 return on Apr. 14, 1990, after Aetna Life & Casualty (Aetna) denied her claim for damage under the Crestview Park Condominium Homeowners' Association (Homeowners' Association) policy.  The record clearly shows, however, that she filed her return on Apr. 9, 1990, before Aetna denied her claim.

[5] Petitioner said that the Homeowners' Association made a special assessment equal to 6 months of dues, but it appears that was in 1991 or later.

Respondent contends that the Homeowners' Association was responsible for making various repairs to petitioner's home. However, petitioner did not have a reasonable prospect of recovery from the Homeowners' Association when she filed her amended 1988 return. Thus, she may deduct as a casualty loss her real property loss even if the Homeowners' Association was responsible for making repairs to her home.[6]

B.  Additions to Tax

1.  Negligence

Negligence is a lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Zmuda v. Commissioner, 731 F.2d 1417, 1422 (9th Cir. 1984), affg. 79 T.C. 714 (1982); Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967), affg. in part and remanding in part 43 T.C. 168 (1964) and T.C. Memo. 1964-299; Neely v. Commissioner, 85 T.C. 934, 947 (1985). Petitioner must show that she acted reasonably and prudently and exercised due care. Neely v. Commissioner, supra.

Respondent argues that petitioner did not use reasonable care in assessing her casualty loss from the earthquake. We disagree.

---

[6] Respondent does not contend that petitioner may not (as a matter of law) deduct a casualty loss for damage to the common areas.

Petitioner has no tax or accounting background. She used a competent contractor to contemporaneously estimate the amount of damage to her home. She was reasonably careful in preparing her loss estimate, and she reasonably relied on her accountant to prepare her return. She gave her accountant all necessary information to prepare her return. She attached to Form 4684, Casualties and Thefts, a detailed inventory of her personal property loss and the $202,200 reduction in the value of her real property by the San Mateo County tax assessor's office. She hired a personal property appraiser to verify her estimates of her personal property loss. Petitioner made a reasonable attempt to figure the amount of her casualty loss. We hold that she was not negligent.

### 2. Substantial Understatement

The next issue for decision is whether petitioner is liable for the addition to tax for substantial understatement of income tax under section 6661(a) for tax years 1985-87. Section 6661(a) provides for an addition to tax in the amount of 25 percent of the amount of any underpayment attributable to a substantial understatement of income tax.

An understatement is the amount by which the correct tax exceeds the tax reported on the return. Sec. 6661(b)(2)(A). An understatement is substantial if it exceeds the greater of 10 percent of the tax required to be shown on the return or $5,000.

Sec. 6661(b)(1)(A). Petitioner bears the burden of proving that imposition of the addition to tax under section 6661 is erroneous. Rule 142(a); Tweeddale v. Commissioner, 92 T.C. 501, 506 (1989).

If a taxpayer has substantial authority for the tax treatment of any item on the return, the understatement is reduced by the amount attributable to it. Sec. 6661(b)(2)(B)(i). Similarly, the amount of the understatement is reduced for any item adequately disclosed either on the taxpayer's return or in a statement attached to the return. Sec. 6661(b)(2)(B)(ii). A taxpayer's position may be adequately disclosed either in a statement attached to the tax return, or on the tax return itself. Id. Respondent contends that petitioner did not have substantial authority for her position but does not deny that she adequately disclosed the casualty loss on her 1985, 1986, and 1987 returns. We consider whether petitioner adequately disclosed her position on her 1985, 1986, and 1987 returns.

Disclosure can be accomplished under section 6661 by providing sufficient information on the tax return to enable the Commissioner to identify the potential controversy. Schirmer v. Commissioner, 89 T.C. 277, 285-286 (1987).

The Commissioner may promulgate revenue procedures which prescribe the circumstances in which information provided on a

tax return is adequate disclosure under section 6661. Sec. 1.6661-4(c), Income Tax Regs. Section 4(a)(5) of Rev. Proc. 89-11, 1989-1 C.B. 797, 798, provides that to adequately disclose a casualty loss for purposes of section 6661, the taxpayer must complete Form 4684 and attach it to the return.

Petitioner attached Forms 4684 to the amended returns she filed for 1985, 1986, and 1987. In them, she described her real and personal property loss from the earthquake. She included a detailed inventory of her personal property that was damaged or destroyed by the earthquake. We conclude that petitioner adequately disclosed her casualty loss on her 1985, 1986, and 1987 returns. Rev. Proc. 89-11, sec. 4(a)(5). Thus, we hold that petitioner is not liable for the addition to tax under section 6661 for 1985, 1986, and 1987.

3. Accuracy-Related Penalty

Taxpayers are liable for a penalty equal to 20 percent of the part of the underpayment attributable to negligence or disregard of rules or regulations. Sec. 6662(a) and (b)(1). Negligence includes a failure to make a reasonable attempt to comply with the provisions of the internal revenue laws or to exercise ordinary and reasonable care in the preparation of a tax return. Sec. 6662(c).

Petitioner bears the burden of proving that she is not liable for the accuracy-related penalty. Rule 142(a).

For the reasons stated at paragraph B-1, above (pp. 34-35), we hold that petitioner is not liable for the accuracy-related penalty for 1989.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.