S. P. Keith, Jr., and Marguerite C. Keith, Petitioners *v.* Commissioner of Internal Revenue, Respondent

Docket No. 1130–67.    Filed April 8, 1969.

*S. P. Keith, Jr.,* pro se.
*Robert W. Goodman,* for the respondent.

42

44

OPINION

The question is whether petitioner is entitled to a deduction for a casualty loss, under subsections (a) and (c)(3) of section 165,[3] as a result of the destruction of the lake and his recreation equipment in the flash flood. Petitioner contends that he is entitled to a deduction measured by the decrease in the fair market value of his real property, plus the fair market value of the destroyed equipment. Respondent does not deny that the damage caused by the flood arose from a "casualty"; but he urgently insists that the words of the restrictive covenant, "Green Valley, Inc. shall retain title to all dams, dam sites, spill ways, lakes," establish the boundary of petitioner's property at the water's edge; that the lake was not, therefore, the "property" of petitioner within the meaning of section 165(c)(3) ; and that, consequently, the loss with respect to the real estate was not petitioner's loss but that of GVI. As to the recreation equipment, respondent argues that petitioner failed to establish the value of the lost or destroyed property.[4]

To support his position that petitioner suffered no loss with respect to his real property, respondent relies primarily upon *West* v. *United States*, 163 F. Supp. 739 (E.D. Pa. 1958), affirmed per curiam 259 F. 2d 704 (C.A. 3, 1958), in which a casualty loss was claimed by an individual taxpayer for the diminution in value of her property fronting on a lake which had been destroyed by a flood.[5] The lake, the dam, and the lots surrounding the lake were owned by an incorporated social club of which the taxpayer was a member. The taxpayer's lot was held under a 99-year lease, and none of the property owned by her was damaged. The District Court concluded that the taxpayer, as a member of the club, was not entitled to a deduction for

---

[3] SEC. 165. LOSSES.

    (a) GENERAL RULE.—There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.

    \*       \*       \*       \*       \*       \*       \*

    (c) LIMITATION ON LOSSES OF INDIVIDUALS.—In the case of an individual, the deduction under subsection (a) shall be limited to—

    \*       \*       \*       \*       \*       \*       \*

    (3) losses of property not connected with a trade or business, if such losses arise from fire, storm, shipwreck, or other casualty, or from theft. No loss described in this paragraph shall be allowed if, at the time of the filing of the return, such loss has been claimed for estate tax purposes in the estate tax return.

[4] We assume that respondent is satisfied that petitioner's basis in the equipment was not less than the claimed loss since the amount of that basis was not placed in issue by either the notice of deficiency, pleadings, or briefs.

[5] The same casualty was involved, and similar conclusions reached, in *Hine* v. *Tomlinson*, an unreported case (M.D. Fla. 1962, 11 A.F.T.R. 2d 315, 63–1 U.S.T.C. par. 9142), reversed on another issue 329 F. 2d 462 (C.A. 5, 1964), and *Earl S. Orr*, T.C. Memo. 1960–147.

a casualty loss, basing its decision on precise, narrow grounds as follows (163 F. Supp. at 741) :

> Plaintiff clearly has a property interest in her leasehold and in the cottage built on it. She has no property interest, however, in the dam or lake. Her right to use corporate property comes solely and entirely from her membership. This right is conferred by the corporate charter and by-laws. Her claim to a casualty loss deduction would have more force if her rights in the lake were granted by the lease. In that case her property interest in the leasehold might well be considered to extend to an easement in the lake.

The factual differences between the present case and *West* are apparent and we think they require an opposite result. Here petitioner's rights in the lake did not stem from his ownership of stock in GVI; indeed, neither the certificate of incorporation nor the bylaws of GVI even purport to confer any such rights. These instruments are cast in the form ordinarily used by business corporations and do not refer in any way whatever to the use by the shareholders of the lake or any other corporate property. Petitioner's rights in the lake stemmed primarily from his ownership in fee (not merely a lease), subject to the restrictive covenant, of a portion of the lakebed [6] and the land adjoining the lake. While the restrictive covenant limited his rights in the lake in certain respects, it also conferred certain rights on him with respect to the use of the lake as well as the adjoining property, e.g., the right to go across the property of the other lot owners for recreational purposes.

Disregarding for the moment the restrictive covenant, we think it apparent that petitioner, by virtue of his warranty deeds to a part of the lakebed and to the adjoining land, possessed valuable property rights in the lake which were destroyed by the flood. The owners of the land underlying an artificial lake and the land bordering upon such a lake have property rights in the water by virtue of their ownership of the land. These rights include the right to make reasonable use of the lake. *Southern Ry. Co.* v. *Lewis*, 165 Ala. 555, 51 So. 746, 749 (1910) ; see *Hood* v. *Murphy*, 231 Ala. 408, 165 So. 219, 220 (1936) (fishing rights). Also see *Akron Canal & Hydraulic Co.* v. *Fontaine*, 72 Ohio App. 93, 50 N.E. 2d 897, 902 (1943) (fishing and boating rights) ; *Burt* v. *Munger*, 314 Mich. 659, 23 N.W. 2d 117, 120 (1946) (right to construct a wharf or pier).

In the present case, these littoral rights added substantially to the value of petitioner's property. His property was located in a remote farming area but consisted of acreage too small for economic use as a farm; its value lay mainly in its recreational use. Destruction of the littoral rights through the drainage of the lake obviously caused an

---

[6] Respondent concedes on brief that part of the realty described in petitioner's deeds "was under the waters of the lake."

economic loss to petitioner, and absent the restrictive covenant he manifestly would be entitled to a casualty loss deduction therefor.

The question thus becomes whether the restrictive covenant, to which petitioner's deeds were subject, deprived him of any "property" interest in the lake within the meaning of section 165(c)(3). We do not think it did.

While the restrictive covenant spoke of GVI's rights to the lake and dam in terms of the retention of "title," those retained rights were only temporary ones. The restrictive covenant, by its terms, was effective until January 1, 1978, at which time it was to be automatically renewed for successive 5-year periods unless a specified percentage of the shareholders agreed in writing to change the covenants in whole or in part. In addition, it provided that "In the event that the lake or lakes cease to exist, the land, dam, dam sites, spillways, shall revert to the owner of the forty-acre tract."

Furthermore, the rights were retained for only a limited, specific purpose: "so that all shareholders shall at all times be subject to such rules and regulations as may be adopted by Green Valley, Inc. to promote the health, wellbeing, safety, and well-regulated recreational activities of the users of said realty and facilities." The lots could be sold, owned, or used only by an individual who was also a shareholder, and each shareholder was required to own a lot in the tract. No structure could be built on any lot unless the building plans, specifications, and plot plan had been approved in writing by the board of directors of GVI "as to its harmony with other developments of said realty." The owner of each lot was given an easement to go across the land contained in each other lot at reasonable times "solely for * * * recreational purposes," and GVI was given authority to specify rules relating to the use of such easements.

When viewed in this context, it seems clear that GVI's rights were in the nature of an equitable easement, covering only the dam and the surface of the lake, with ownership of both the lakebed and the adjacent land being vested in the lot owners, including petitioner.[7] The rights retained and the restrictions imposed were not for the benefit of the corporation, but were for the benefit of the lot owners. Not infrequently provisions, analogous to those included in the restrictive

---

[7] As noted above, fn. 6, *supra,* and accompanying text, petitioner's deeds described a portion of the property under the lake. Even had the deeds described the tracts as being bounded by the lake, such a description presumptively would have conveyed to petitioner ownership of the lakebed to the thread of the lake. This presumption could have been overcome only "by *express* words or by such a description as *clearly* excludes [the property under the water] from the land conveyed." (Emphasis added.) *Stewart* v. *Turney,* 237 N.Y. 117, 142 N.E. 437, 439 (1923). This is the law in Alabama. *Rollan* v. *Posey,* 271 Ala. 640, 126 So. 2d 464, 466 (1961); *Greenfield* v. *Powell,* 218 Ala. 397, 118 So. 556, 558 (1928). Neither the restrictive covenant nor the deeds to petitioner contains "express words" or "such a description as clearly excludes" that can be construed to deprive petitioner of ownership of a part of the lakebed.

covenant, are inserted in deeds granted by developers of real estate subdivisions to regulate the kind of dwellings that may be constructed, their location, and the manner in which individual properties are to be used. See, e.g., *Vaughan* v. *Fuller*, 278 Ala. 25, 175 So. 2d 103 (1965) ; *Scheuer* v. *Britt*, 218 Ala. 270, 118 So. 658 (1928). Where the subdivided tract also contains an area, such as a park or lake, set off for the common use of the lot owners in the subdivision, and authority to maintain this common area and to regulate its use is vested in a separate entity, the entity is held to have no more than "an easement * * * with specific restrictions and conditions as to the use and management of the easement," the individual lot owners taking fee title to a proportionate share of the common area adjoining their lot. *United States* v. *11.06 Acres of Land, Etc.*, 89 F. Supp. 852, 858 (E.D. Mo. 1950) ; see generally *Johnston* v. *Harsh*, 207 Ala. 524, 93 So. 451 (1922).

We are confirmed in our view of the meaning of the deeds and covenant by the fact that GVI existed merely to oversee the proper recreational use of the lake and related shore properties by the lot owners who were its only shareholders. GVI had no other active function. It had no source of income and its nominal capital was insufficient to maintain the recreational facilities. Assessments were levied by the landowner-shareholders on themselves to cover expenses as they arose, including the cost of rebuilding the dam. GVI served as a forum for the discussion of recreation rules on such matters as fishing, hunting, water skiing, and other matters of common interest. For all practical purposes, the situation was the same as if the lot owners had hired GVI to manage the lake, giving it the necessary rights and powers to execute its duties.

We think it clear that in every practical sense, legal as well as economic, the loss resulting from the destruction of the dam and lake was that of petitioner and the other lot owners, not that of the corporation. The entire burden of the loss fell on them. Petitioner's loss was not a temporary one due to buyer resistance, see *Harvey Pulvers*, 48 T.C. 245 (1967), affirmed per curiam 407 F. 2d 838 (C.A. 9, 1969), or to a voluntary decision that could be reversed at any time in the future, see *Citizens Bank of Weston*, 28 T.C. 717 (1957), affd. 252 F. 2d 425 (C.A. 4, 1958), but was the result of actual, physical damage to his property interest in the lake. We hold that petitioner qualifies for a deduction under section 165 (a) and (c) (3).

Having concluded that petitioner is entitled to a deduction for 1963 for the casualty loss sustained to his property, we must now determine the amount of that deduction. Petitioner contends that the measure of the deduction is, according to section 1.165–7 (b) (1), Income Tax

Regs.,[8] the difference between the fair market value of his property immediately before and immediately after the flood.

Petitioner provided us with expert testimony of a competent appraisal showing the difference in value between his precasualty property and postcasualty property, thus complying with the general rule set forth in section 1.165–7(a)(2)(i), Income Tax Regs.[9] However, we are not convinced that the appraisal is the most reliable yardstick to use in determining petitioner's loss, for the last clause in that regulation points out that the deduction for a casualty loss "shall be limited to the *actual loss* resulting from damage to the property." (Emphasis added.) In cases such as this, a more realistic measure of the deduction is the cost of restoration. *Clapp* v. *Commissioner*, 321 F. 2d 12 (C.A. 9, 1963), affirming 36 T.C. 905 (1961); *Squirt Co.*, 51 T.C. 543, 547 (1969); *Clarence A. Peterson*, 30 T.C. 660 (1958); see sec. 1.165–7(a)(2)(ii), Income Tax Regs. This is the only loss that petitioner has sustained in the economic sense. It is also the only loss he sustained in the tax sense.

The total cost of rebuilding the dam and restoring the lake was $24,858.10. Petitioner's share of such cost was $2,485.81. Hence the amount he may deduct for 1963 as a casualty loss to his land is this sum plus the amount he expended to replace the pier, $431.39, or $2,917.20.[10]

Petitioner also claimed a deduction in the amount of $55.25 for the destruction by the flood of certain equipment described in our findings. Respondent contends that petitioner failed to substantiate

---

[8] Sec. 1.165–7  Casualty losses.

(b) *Amount deductible.*—(1) *General rule.*  In the case of any casualty loss whether or not incurred in a trade or business or in any transaction entered into for profit, the amount of loss to be taken into account for purposes of section 165(a) shall be the lesser of either—

(i) The amount which is equal to the fair market value of the property immediately before the casualty reduced by the fair market value of the property immediately after the casualty; or

(ii) The amount of the adjusted basis prescribed in § 1.1011–1 for determining the loss from the sale or other disposition of the property involved, * * *

[9] Sec. 1.165–7  Casualty losses.

(a) *In general*—* * *

(2) *Method of valuation.*  (i) In determining the amount of loss deductible under this section, the fair market value of the property immediately before and immediately after the casualty shall generally be ascertained by competent appraisal. This appraisal must recognize the effects of any general market decline affecting undamaged as well as damaged property which may occur simultaneously with the casualty, in order that any deduction under this section shall be limited to the actual loss resulting from damage to the property.

[10] This amount is less than petitioner's basis in the property. That his basis was $17,500 is evidenced .not only by his testimony, but from the amount of deed stamps, $13.75 and $5.50, respectively, on the deeds he received. At the rate of 55 cents for each $500 of value or fraction thereof, section 4361, this is evidence of a purchase price of $16,500 to $17,500. The amount of deed stamps on a deed is acceptable evidence of the consideration involved in the transaction. *Park Investment Co.* v. *Board of Revision*, 179 N.E. 2d 784, 787 (Ohio 1962); *Flynn* v. *Palmer*, 270 Wis. 43, 70 N.W. 2d 231, 233 (1955); *In re M'Geehin's Will*, 134 Misc. 334, 235 N.Y.S. 477, 479 (Sur. Ct. 1929).

the amount of this loss. Although we do not have the benefit of any documentary evidence as to the exact amount of these losses, we accept petitioner's testimony that he did sustain them and we believe his estimate of the amount is reasonable. It is our conclusion that petitioner is entitled to a casualty loss deduction for the destroyed equipment in the amount claimed.

*Decision will be entered under Rule 50.*