Wingate E. Swain and Florence S. Swain v. Commissioner.
Swain v. Commissioner
Docket No. 5760-68.
United States Tax Court
T.C. Memo 1970-278; 1970 Tax Ct. Memo LEXIS 81; 29 T.C.M. (CCH) 1254; T.C.M. (RIA) 70278; September 30, 1970. Filed Charles C. Shaw, 112 North Martin St., P.O. Box 710, Elizabeth, N.C. for the petitioners. Robert E. Lee, for the respondent. FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: Respondent has determined deficiencies in petitioners' Federal income tax for the years 1964 and 1965 in the amounts of $2,633.91 and $2,501.11, respectively. The only issue for decision is whether petitioners have substantiated the amount of casualty losses sustained by them in 1964 and 1965 with respect to their property. Findings of Fact Petitioners herein are Wingate E. Swain (hereinafter sometimes referred to as Wingate) and his wife, Florence S. Swain (hereinafter sometimes referred to as Florence), who, during the taxable years 1964 and *82 1965, and at the time the petitions in the instant case were filed, resided at Washington, North Carolina. Their joint income tax returns for 1964 and 1965 were filed with the district director of internal revenue, Greensboro, North Carolina. Between 1959 and 1964 petitioners acquired approximately 55 acres of farm land located in Washington, North Carolina, at a cost in excess of the losses herein involved. In 1964, petitioners constructed a dam on their property and cleared trees from a portion thereof which became the basin of an artificial lake created by the dam. The dam was constructed entirely from earth and had a roadway running along the top. Its dimensions were as follows: 230 feet long, 77 feet wide at the base, 12 feet wide at the top and 15.2 feet high. Total cost for clearing the land and constructing the dam was $6,228.99 of which $5,206.74 was attributable to the dam. In 1964, Hurricane Dora washed out approximately 30 percent of the dam, chiefly at the north end in the vicinity of the dam's spillway. The lake created by the dam was destroyed, leaving a visible unsightly basin where the water had once been. Also, some 950 to 1,000 cypress logs were lost and approximately *83 one percent of the trees on the property were blown down. The land was cleared and the dam repaired at a cost of $5,125.96, [1] not including the cost of depreciation on a tractor, a boat and two chain saws which were utilized solely in the repair operations. After reconstruction, the dam was 100 to 150 feet longer than it had previously been. Some large 36-inch pipes were installed in the dam and under a new spillway, and a new concrete flume was constructed to carry off more water. 1255 The earth road over the dam was not restored. In January 1965, petitioners acquired 1.72 acres of land contiguous to the abovementioned property at a cost of $4,000, in order to gain access to a portion of the property which was formerly accessible only by means of the road over the dam. In late July 1965, heavy rains again washed away approximately 30 percent of the dam, chiefly at its center. The lake again was destroyed. Also, a canoe, purchased in 1963 at a cost of $188, was damaged beyond repair. Petitioners *84 made repairs to the dam and cleared the property at a cost of $3,841.59, which included the cost of depreciation on equipment utilized in the operation. In reconstruction, the dam was lengthened about 100 feet at its south end and the spillway was stabilized with concrete rather than grass. The dam was not, however, fully repaired. In their 1964 and 1965 returns, petitioners deducted amounts of $8,550 and $8,400, respectively, as casualty losses to their property. They based these figures on the alleged fair market values of their entire property before and after each casualty. Respondent disallowed parts of these amounts in his statutory notice of deficiency. Opinion Petitioners' property was damaged twice. They contend that the amount of their casualty loss deductible under section 165(a) and (c) [2] must be measured by the fair market value of the property before and after the casualty, citing section 1.165-7 (a)(2)(i), Income Tax Regs.[3] Respondent contends, on the other hand, that the loss is most accurately evaluated by reference to the cost of repairing the dam and clearing the property. He argues that any fluctuation in the fair market value of the property was temporary, *85 due to the destruction of the lake which could be restored by repair of the dam and clearing the lake basin. Petitioners' evidence as to the fair market value of the *86 land consisted of the testimony of two witnesses. Robert L. Mohler (hereinafter referred to as Mohler), their first witness, testified that its fair market value immediately before and after the first casualty was $35,550 and $26,900, respectively. He also testified that its fair market value immediately before the second casualty was $39,500 and after, $31,000. These latter two figures do not include the value of the property purchased after the first casualty; however, they do take into account certain landscaping done on a portion of the property which was to become petitioners' home. Petitioners' other witness, Edgar F. McGrath (hereinafter sometimes referred to as McGrath) valued the land prior to the building of the dam at $17,600. After completion of the dam and prior to the hurricane, he valued the property at $30,800. Immediately after the first casualty he valued it at $19,800. His figures for the second casualty were $41,400 immediately before and $28,750 after. We need not and do not decide what the fair market value of this land before and after the casualties was, since we believe that this value is not representative of the actual physical damage loss to the land *87 for which a deduction is allowable. It is clear from the record that aside from trees which had fallen on parts of the land, the actual physical damage was to the dam which, in turn, caused the temporary destruction of the lake. Where the lake had once been, an aesthetically unsightly mess was created. This loss, we think, was the primary factor in depressing the value of the property. The wide differences of fair market value, testified to by both petitioners' witnesses, were geared to the absence or presence of the lake and in turn, therefore, to the dam. For example, according to McGrath, the property was 1256 worth only $17,600 before the lake and dam were constructed. After creation of the lake, he thought the value was increased by $13,200; yet expenditures for construction of the lake and dam only cost approximately half that amount. Even if we were to accept these wide fluctuations in the value of the entire parcel of land, it is clear that they were only temporary reflections of the loss of the lake. These decreases were not therefore due to any physical damage to the entire parcel of land itself, but solely to the loss of the dam and the lake. In S.P. Keith, Jr., 52 T.C. 41 (1969), *88 the taxpayer owned a tract of land on a lake and a portion of the lake bed. A flash flood caused destruction of a pier on the taxpayer's property, damage to certain equipment, and drainage of the lake due to the destruction of a dam. We held that the difference between the fair market value of the property immediately before and after the flood was not the proper figure for valuing the casualty loss. Rather, the cost of repairing the dam, which taxpayer shared with other property owners on the lake, was the proper amount to be considered in determining the loss. We stated (p. 49); Petitioner provided us with expert testimony of a competent appraisal showing the difference in value between his precasualty property and post-casualty property, thus complying with the general rule set forth in section 1.165-7(a)(2)(i), Income Tax Regs. However, we are not convinced that the appraisal is the most reliable yardstick to use in determining petitioner's loss, for the last clause in that regulation points out that the deduction for a casualty loss "shall be limited to the actual loss resulting from damage to the property." (Emphasis added.) In cases such as this, a more realistic measure of *89 the deduction is the cost of restoration. Clapp v. Commissioner, 321 F. 2d 12 (C.A. 9, 1963), affirming 36 T.C. 905 (1961); Squirt Co., 51 T.C. 543, 547 (1969); Clarence A. Peterson, 30 T.C. 660 (1958); see sec. 1.165-7(a)(2)(ii), Income Tax Regs. This is the only loss that petitioner has sustained in the economic sense. It is also the only loss he sustained in the tax sense. There is no viable distinction between Keith, supra, and the instant case. Its rationale and holding are controlling herein. Accordingly, we consider the most representative figure to be the cost of restoring the dam and clearing the land. Petitioners stipulated that the repair cost, after the first casualty, exclusive of depreciation and repair to equipment, was $4,878.50. On brief and at trial, they contended that the following amounts be added to represent the total repair cost: $152.29 in Federal and state unemployment taxes for employees; $95.17 in gasoline and repair expense; $487 in depreciation on a tractor, chain saws and boat motor utilized in the work; and $3,500 representing the alleged value of a lot on the property from which dirt *90 was removed to construct the dam. Respondent did not dispute the validity of the first two figures insofar as adding them to the repair cost. He did contend on brief that the equipment-depreciation figure should not be allocated 100 percent to repair costs since the equipment was not utilized solely in repair work. We have found, however, that the equipment was utilized solely in the repair operations, based on Florence's statements at trial which we believe to be truthful. As for the $3,500 figure for dirt, we cannot accept the alleged value of a plot of land as the cost figure for dirt itself. That figure must be obtained through the price of dirt on the open market, and there is absolutely no such proof in the record. Thus, the substantiated cost of repair is $5,612.96, including depreciation and other expenses not in the stipulation. While respondent accepts the above figures, he argues that the dam as repaired in 1964, was considerably improved, i.e., its length was increased 100 to 150 feet; large 36-inch pipes were placed in the dam for stabilization purposes, and a new flume was constructed. Hence, only a portion of the repair cost, which portion he sets at $3,500, can be *91 considered a proper indication of the amount of actual casualty loss. We agree that only the amount necessary to place the dam in the same condition as before the damage and to recreate the lake as it existed prior to the casualty is representative of the loss incurred. See Regs. sec. 1.165-7(a)(2)(ii). [4] 1257 There is very little evidence in the record to refute respondent's contention that the dam was improved and enlarged, other than an opinion by Mohler that there was no improvement, which opinion seemed to be based entirely on the fact that the roadway was gone. Nor is there any evidence that the enlargement was necessary to create the lake as it existed prior to the casualty. *92 In the absence of such evidence, we agree that the total repair cost figure must be reduced if it is to represent the actual casualty loss; moreover, respondent's proposed amount of $3,500 for the casualty loss seems to us to be quite generous. The original dam was enlarged anywhere from 100 to 150 feet. There were additions of 36-inch pipes and a new flume, of which the costs are unknown. Since only 30 percent of the old dam was washed out thus not necessitating a rebuilding of the entire structure, we cannot say that respondent's figure for the entire restoration should be increased. It was petitioners' burden to prove otherwise. Accordingly, we hold that the casualty loss allowable is $3,500 for 1964. Insofar as the 1965 loss is concerned, petitioners stipulated that repair to the dam cost $2,142.36, exclusive of depreciation on and repairs to their tractor and chain saws. At trial, Florence testified that the total cost for repairing the dam and clearing the land was $3,841.59 which included depreciation on equipment, repair expenses and labor expense, [5] including social security. Petitioners would also have us add to the $3,841.59 the sum of $3,500 for the dirt taken from their *93 lot and utilized in construction. As we have indicated in our prior discussion, this last factor is not acceptable. Respondent does not dispute the $3,841.59 figure, other than to contend that it should be reduced by a portion of the depreciation on the equipment because the equipment was not totally utilized in the repair operation. This contention we reject for the same reasons given with regard to 1964. Thus the total substantiated cost is $3,841.59. Respondent contends that the entire repair cost cannot be considered representative of the casualty because the dam was lengthened another 100 feet and a spillway was stabilized with concrete. There is no evidence to prove that the dam was not improved or that the lengthening and other addition was necessitated in order to recreate the lake as it had been immediately prior to the casualty. Accordingly, the entire repair cost figure cannot be considered representative. Respondent proposes the figure *94 of $2,750 as the casualty loss for 1965 and in light of the additions to the dam we cannot consider this amount as unfair, even considering that it also includes an allowance for the loss of the boat which, after more than one and one-half years of service, could not have been worth any more than $100. Cohan v. Commissioner, 39 F. 2d 540 (C.A. 2, 1930). Accordingly, we hold that the casualty loss to petitioners' property in that year was $2,750. Petitioners on brief claimed a loss of 700 cypress logs in 1965 which were valued by Wingate at approximately $1.50 each. Wingate stated, however, that the logs were lost in 1964. At any rate, petitioners have not shown their basis in the logs, which would limit any recovery for their loss, nor do we have any means to compute said basis. The logs were cut from petitioners' land; however, we were presented with no allocation between the value of the land and the trees so as to compute an original basis in both from which we could limit the loss. Accordingly, this loss must be denied due to lack of substantiation. Decision will be entered under Rule 50. Footnotes
1. The stipulated figure is $4,878.50, but Florence testified without objection to tractor gasoline and repair expense of $95.17 and Federal and state unemployment taxes of $152.29.↩
2. SEC. 165. LOSSES. (a) General Rule. - There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. * * * (c) Limitation on Losses of Individuals. - In the case of an individual, the deduction under subsection (a) shall be limited to - * * * (3) losses of property not connected with a trade or business, if such losses arise from fire, storm, shipwreck, or other casualty, or from theft. * * * ↩
3. Sec. 1.165-7(a)(2)↩ Method of valuation. (i) In determining the amount of loss deductible under this section, the fair market value of the property immediately before and immediately after the casualty shall generally be ascertained by competent appraisal. This appraisal must recognize the effects of any general market decline affecting undamaged as well as damaged property which may occur simultaneously with the casualty, in order that any deduction under this section shall be limited to the actual loss resulting from damage to the property.
4. (ii) The cost of repairs to the property damaged is acceptable as evidence of the loss of value if the taxpayer shows that (a) the repairs are necessary to restore the property to its condition immediately before the casualty, (b) the amount spent for such repairs is not excessive, (c) the repairs do not care for more than the damage suffered, and (d) the value of the property after the repairs does not as a result of the repairs exceed the value of the property immediately before the casualty.↩
5. On brief petitioners added the labor expense to $3,841.59 to represent the cost of repair. We do not construe Florence's testimony to indicate that the labor expense was over and above the $3,841.59 figure testified to by her.↩