CHRISTINA A. ALPHONSO, PETITIONER *v.* COMMISSIONER OF
INTERNAL REVENUE, RESPONDENT

Docket No. 17130–08.        Filed March 16, 2011.

P owned stock in CV, a cooperative housing corporation as defined in sec. 216(b), I.R.C., and leased from CV pursuant to a so-called proprietary lease an apartment in a building that CV owned. A retaining wall that CV owned collapsed, thereby causing certain damage. CV levied an assessment against each of its stockholder-tenants, including P, with respect to the damage caused by the collapse of the retaining wall. P paid to CV the assessment (retaining wall assessment) that CV levied against her. P filed a Federal income tax return for her taxable year 2005 in which she claimed a casualty loss in an amount that was equal to the retaining wall assessment and a deduction in a reduced amount as required by the Internal Revenue Code with respect to that claimed casualty loss. R disallowed the claimed casualty loss and the claimed deduction with respect to that claimed loss. It is P's position that she is entitled to a deduction under sec. 165(a) and (c)(3), I.R.C., or in the alternative under sec. 216(a), I.R.C., with respect to the retaining wall assessment. *Held*: P is not entitled to a deduction under sec. 165(a) and (c)(3), I.R.C., or sec. 216(a), I.R.C., with respect to the retaining wall assessment.

*Harvey R. Poe*, for petitioner.
*Daniel P. Ryan*, for respondent.

OPINION

CHIECHI, *Judge*: This case is before us on respondent's motion for summary judgment (respondent's motion). We shall grant respondent's motion.

## *Background*

The record establishes and/or the parties do not dispute the following.

At the time she filed the petition in this case, petitioner resided in New York.

During 2005, the year at issue,[1] petitioner owned shares of stock in Castle Village Owners Corp. (Castle Village), a cooperative housing corporation as defined in section 216(b).[2] Castle Village owned a tract of land that overlooks the Henry Hudson Parkway and Riverside Drive in New York, New York. At a time not disclosed by the record before the year at issue, Castle Village constructed on that land, inter alia, 5 multistory buildings in which there are a total of 589 apartments. (We shall refer collectively to the tract of land that Castle Village owned and the buildings and other improvements that it constructed on that land as the Castle Village complex.)

As a stockholder of Castle Village, petitioner had the right to enter into a so-called proprietary lease (proprietary lease) with Castle Village with respect to the apartment in the Castle Village complex to which Castle Village had allocated the shares of stock in Castle Village that she owned. On a date not disclosed by the record before the year at issue, petitioner and Castle Village executed such a proprietary lease with respect to that apartment.[3] Petitioner lived in the apartment to which Castle Village had allocated her shares

---

[1] Unless otherwise indicated, the factual background pertains to 2005, the year at issue.

[2] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.

[3] The record does not contain the proprietary lease that petitioner and Castle Village executed. However, the record does contain a model proprietary lease (model proprietary lease) that the parties do not dispute is materially identical to the proprietary lease that petitioner and Castle Village executed.

of stock in Castle Village and with respect to which she had executed the proprietary lease.

The model proprietary lease provided in pertinent part:

WHEREAS, the Lessor [Castle Village] is the owner of the land and the buildings erected thereon at 110–200 Cabrini Boulevard, New York, New York, hereinafter called the buildings.

WHEREAS, the Lessee [the stockholder of Castle Village] is the owner of _____ shares of the Lessor, to which this lease is appurtenant and which have been allocated to apartment _____ in the building; _____ Cabrini Boulevard, New York, New York;

DEMISED PREMISES AND TERM

NOW, THEREFORE, in consideration of the premises, the Lessor hereby leases to the Lessee, and the Lessee hires from the Lessor, subject to the terms and conditions hereof, Apartment _____ in the building at _____ Cabrini Boulevard, New York, New York (hereinafter referred to as the apartment) for a term from _____, 19____, until December 31, 2036 (unless sooner terminated as hereinafter provided). As used herein, "the apartment" means the rooms in the buildings as partitioned on the date of the execution of this lease designated by the above-stated apartment number, together with their appurtenances and fixtures and any closets, terraces, balconies, roof, or portion thereof outside of said partitioned rooms, which are allocated exclusively to the occupant of the apartment.

Rent (Maintenance) How Fixed

1. (a) The rent (sometimes called maintenance) payable by the Lessee for each year, or portion of a year, during the term shall equal that proportion of the Lessor's cash requirements for such year, or portion of a year, which the number of shares of Lessor allocated to the apartment bears to the total number of shares of the Lessor issued and outstanding on the date of the determination of such cash requirements. Such maintenance shall be payable in equal monthly installments in advance on the first day of each month, unless the Board of Directors of the Lessor (hereinafter called Directors) at the time of its determination of the cash requirements shall otherwise direct. The Lessee shall also pay such additional rent as may be provided for herein when due.

\*　\*　\*　\*　\*　\*　\*

Cash Requirements Defined

(c) Whenever used herein the term "cash requirements" shall mean the estimated amount in cash which the Directors shall from time to time in their judgment determine to be necessary or proper for (1) the operation, maintenance, care, alteration and improvement of the corporate property during the year or portion of the year for which such determination is made; (2) the creation of such reserve for contingencies as they may deem proper; and (3) the payment of any obligations, liabilities or expenses incurred or to be incurred, after giving consideration to (i) income expected to be received during such period (other than rent from proprietary les-

sees), and (ii) cash on hand which the Directors in their discretion may choose to apply. The Directors may from time to time modify their prior determination and increase or diminish the amount previously determined as cash requirements of the corporation for a year or portion thereof. No determination of cash requirements shall have any retroactive effect on the amount of the rent payable by the Lessee for any period prior to the date of such determination. All determinations of cash requirements shall be conclusive as to all lessees.

\* \* \* \* \* \* \*

Lessor's Repairs

2. The Lessor shall at its expense keep in good repair all of the buildings including all of the apartments, the sidewalks and courts surrounding the same, and its equipment and apparatus except those portions the maintenance and repair of which are expressly stated to be the responsibility of the Lessee pursuant to Paragraph 18 hereof.[4]

\* \* \* \* \* \* \*

Penthouses, Terraces and Balconies

7. If the apartment includes a terrace, balcony, or a portion of the roof adjoining a penthouse, the Lessee shall have and enjoy the exclusive use of the terrace or balcony or that portion of the roof appurtenant to the penthouse, subject to the applicable provisions of this lease and to the use of the terrace, balcony or roof by the Lessor to the extent herein permitted. The Lessee's use thereof shall be subject to such regulations as may, from time to time, be prescribed by the Directors. \* \* \* No planting, fences, structures or lattices shall be erected or installed on the terraces, balconies, or roofs of the buildings without the prior written approval of the Lessor. No cooking shall be permitted on any terraces, balconies or the roofs of the buildings, nor shall the walls thereof be painted by the Lessee without the prior written approval of the Lessor. \* \* \*

\* \* \* \* \* \* \*

House Rules

13. The Lessor has adopted House Rules which are appended hereto, and the Directors may alter, amend or repeal such House Rules and adopt new House Rules. This lease shall be subject to such House Rules which, when a copy thereof has been furnished to the Lessee, shall be taken to be part hereof. The Lessee hereby covenants to comply with all such House Rules and see that they are faithfully observed by the family, guests, employees and subtenants of the Lessee. Breach of a House Rule shall be a default under this lease. The Lessor shall not be responsible to the Lessee for the nonobservance or violation of House Rules by any other Lessee or person.

---

[4] Par. 18(a) of the proprietary lease provided that the lessee is responsible for repairs and maintenance to the interior of the apartment that is the subject of the lease, including maintenance, repair, and replacement of plumbing, gas and heating fixtures, appliances (e.g., refrigerators, air conditioners, ranges), lighting and electrical fixtures, fuse boxes and circuit breakers, and electrical wiring running into and through the apartment.

As provided in paragraph 13 of the model proprietary lease (quoted above), that lease was subject to so-called house rules (Castle Village board house rules) that the board of directors of Castle Village (Castle Village board) had approved. Those house rules provided in pertinent part:

GARDEN AND PLAY AREA

The grounds of Castle Village include beautifully landscaped gardens and a children's playground. Use of these areas is limited to building residents and their guests. Pets are not permitted. Residents are reminded to inform their guests and caretakers of the rules since everyone is expected to follow them.

Security guards have been instructed to escort nonresidents off the property if they are not in the company of a resident. If a security guard does not recognize you as a Castle Village resident, you may be asked to show identification. Cooperate with him by doing so and telling him your name and apartment number.

Usage areas in the garden:



Use of designated areas

A1 Safe Play......Wading pool, sandbox, climbing
A2 ....................Activity has not been permanently established (see seasonally published Garden Rules [5]).
A3 ....................Activity has not been permanently established (see seasonally published Garden Rules).

---

[5] The record does not contain the so-called Garden Rules to which the Castle Village board house rules referred.

A4 .....................Activity has not been permanently established (see season-
ally published Garden Rules).
B2 .....................Activity has not been permanently established (see season-
ally published Garden Rules).
B1 Quiet Area...Sitting, reading, picnics
C Quiet Area.....Sitting, reading
Pit Active Play..Basketball, handball (10 a.m. to dusk) (1 hour limit on use
when others are waiting)

*All other grass areas may not be used. Please use the
footpaths at all times*

The following are not permitted in the garden

- Audible radio or cassette players
- Bicycles without training wheels
- Pets
- Barbecues or any open fire
- Picking or cutting any part of the landscape
- Bats, sticks, racquets or hardballs
- Water balloons
- Smoking in any "A" Area
- Making noise after dusk
- Urinating
- Climbing trees
- Large water guns

Tri/bicycle, scooter and roller blade rules

Tricycles, bicycles with training wheels, roller blades/skates and scooters
are permitted only on the pathway around Areas A2 and A3.

Sandbox and wading pool rules (Area A1)

- Keep sand in the sandbox. Do not dump sand into the wading pool.
- Drain pool periodically throughout the day to ensure the circulation of
  clean water.
- Unplug the drain each evening.
- Children who are not toilet trained must wear diapers or pull-ups at all
  times.
- Follow posted wading pool and sandbox guidelines.

Trash and garbage

Trash barrels are located throughout the garden for disposal of garbage
and cigarette butts. Soiled diapers, used bandages, et cetera must be
placed in sealed plastic bags before disposal. Large quantities of garbage
resulting from picnics and parties should be taken to the garbage room in
your building.

Garden plots

Vegetable garden plots are located behind Area A1. These plots are
reserved for and tended by residents. This is NOT a communal garden.
Please DO NOT pick from them. A subcommittee of the Garden Committee
organizes this. Please contact them if you would like to use a plot. There

is also an herb garden from which all residents are invited to pick sprigs for cooking. It is located in the circle on the path between Buildings 120 and 140.

Garden gatherings

Garden parties of 25 or fewer persons are permitted in Areas A2 and A3. Advance permission is required from the Management Office. A $25 deposit (fee subject to change) is required to hold a date. The deposit will be refunded if the garden area is left clean and undamaged. Contact the Management Office to arrange a date and time for your event. If you wish to use the Playspace as a bad weather backup, separate arrangement must be made with the Playspace coordinators. The garden is not available for large parties or catered affairs. Tents may not be set up in the garden.

ADULTS ARE RESPONSIBLE FOR SUPERVISING THEIR CHILDREN IN THE GARDEN.

ALL RESIDENTS, THEIR EMPLOYEES AND THEIR FRIENDS ARE EXPECTED TO ADHERE TO THE GARDEN RULES.

NON–RESIDENT CAREGIVERS/BABYSITTERS MAY ONLY USE THE GARDEN WHEN CARRYING OUT THEIR DUTIES.

UNACCOMPANIED GUESTS STAYING IN THE COMPLEX MUST HAVE A PASS FROM THE MANAGEMENT OFFICE.

REASONABLE NUMBERS OF GUESTS, FOR PLAY DATES AND PICNICS ARE PERMITTED.

*Please exercise courtesy and common sense when using the garden and respect the space of others.*

The Castle Village complex included a retaining wall (Castle Village retaining wall) that Castle Village owned. That retaining wall, which was approximately 70 feet high and approximately 250 feet wide, separated the Castle Village complex from certain public roads approximately 65 feet below that complex.

On May 12, 2005, the Castle Village retaining wall collapsed, causing rocks and soil to fall onto the public roads below the Castle Village complex. The collapse of that retaining wall caused significant damage.

Castle Village levied an assessment against each of its stockholders, including petitioner, with respect to the damage caused by the collapse of the Castle Village retaining wall. The assessment that Castle Village levied against petitioner was $26,390 (Castle Village assessment), which she paid.

Petitioner filed timely Form 1040, U.S. Individual Income Tax Return, for her taxable year 2005 (2005 return). In that return, petitioner claimed (1) a casualty loss of $26,390 (claimed 2005 casualty loss), which was the amount of the Castle Village assessment that petitioner had paid to Castle Village in 2005, and (2) a casualty loss deduction of $23,188 (claimed 2005 casualty loss deduction).[6]

Respondent issued to petitioner a notice of deficiency (notice) with respect to her taxable year 2005. In that notice, respondent, inter alia, disallowed the claimed 2005 casualty loss deduction.[7] That was because respondent determined that "The cause of the collapse of the Castle Village Retainer Wall was * * * the result of a gradual weakening of the wall" and that therefore the loss from that collapse does not constitute a casualty loss under section 165(c)(3).

Respondent filed an amendment to answer in this case in which respondent alleged the following additional reason for respondent's disallowance of the claimed 2005 casualty loss deduction: "Because the collapse [of the Castle Village retaining wall] occurred on Castle Village property, any casualty loss deduction must be claimed by the corporation [Castle Village], and not by the stockholders."

## Discussion

We must decide whether petitioner is entitled to a casualty loss deduction with respect to the Castle Village assessment that petitioner paid to Castle Village.[8]

It is petitioner's position that she is entitled to a deduction under section 165(a) and (c)(3) or section 216(a) with respect to the claimed 2005 casualty loss. Respondent disagrees.

---

[6] Petitioner attached to the 2005 return Form 4684, Casualties and Thefts. In that form, petitioner reduced the amount of the claimed 2005 casualty loss as required by sec. 165(h)(1) and (2) in order to arrive at the amount of the claimed 2005 casualty loss deduction.

[7] Except for certain correlative adjustments, the only other determination that respondent made in the notice was to disallow certain employee business expenses of $5,266 that petitioner claimed in the 2005 return. In the petition, petitioner did not allege that that determination is erroneous. Therefore, petitioner is deemed to have conceded respondent's determination to disallow the employee business expenses claimed in the 2005 return. See Rule 34(b)(4); *Funk v. Commissioner*, 123 T.C. 213, 215 (2004); *Swain v. Commissioner*, 118 T.C. 358, 363 (2002).

[8] Respondent does not concede, but assumes solely for purposes of respondent's motion, that the loss from the collapse of the Castle Village retaining wall constitutes a casualty loss under sec. 165(c)(3). Respondent indicates in respondent's motion that if we were to deny respondent's motion, it would be respondent's position that the loss from the collapse of the Castle Village retaining wall does not constitute a casualty loss under sec. 165(c)(3).

We consider first section 165(a) and (c)(3). Before turning to the parties' respective arguments with respect to that section, we shall set forth certain general principles applicable to our analysis thereunder.

As pertinent here, section 165(a) and (c)(3) allows an individual taxpayer to deduct "losses of property not connected with a trade or business or a transaction entered into for profit, if such losses arise from fire, storm, shipwreck, or other casualty". Generally, only the owner of the property damaged by a casualty is entitled to a deduction for a casualty loss sustained to that property. See *Dosher v. United States*, 730 F.2d 375 (5th Cir. 1984); *Draper v. Commissioner*, 15 T.C. 135 (1950). Where a taxpayer has a leasehold interest in property that is damaged by a casualty, the taxpayer is entitled to deduct a casualty loss sustained to that leasehold interest. *Towers v. Commissioner*, 24 T.C. 199, 239 (1955), affd. on this issue sub nom. *Bonney v. Commissioner*, 247 F.2d 237 (2d Cir. 1957).

We turn now to the parties' respective arguments under section 165(a) and (c)(3). In support of respondent's position that petitioner is not entitled to a deduction under section 165(a) and (c)(3) with respect to the claimed 2005 casualty loss, respondent relies principally on *West v. United States*, 163 F. Supp. 739 (E.D. Pa. 1958), affd. 259 F.2d 704 (3d Cir. 1958). [9]

In *West*, the taxpayer was a member of an incorporated social club (corporation) that owned a large tract of land on which the corporation constructed a dam for the purpose of creating an artificial lake. *Id.* at 740. The taxpayer, like all the members of the corporation, leased from that corporation under a 99-year lease a lot on which the taxpayer built a cottage. *Id.* at 741. Only members of the corporation were entitled to lease lots, and only persons who entered into leases with the corporation were entitled to be members of the corporation. *Id.* The lease that the taxpayer executed with the corporation gave the taxpayer only the right to use the lot. *Id.* The taxpayer's membership in the corporation gave her (as well as the other members of that corporation) the right

---

[9] Respondent also relies on *Orr v. Commissioner*, T.C. Memo. 1960–147, and *Hine v. Tomlinson*, 11 AFTR 2d 315, 63–1 USTC par. 9142 (M.D. Fla. 1962), revd. on other grounds 329 F.2d 462 (5th Cir. 1964), in support of respondent's position that petitioner is not entitled to a deduction under sec. 165(a) and (c)(3) with respect to the claimed 2005 casualty loss.

to use the property of the corporation, including the artificial lake. *Id.* In 1955, a hurricane destroyed the dam, thereby causing the artificial lake to drain. *Id.* at 740. The corporation levied an assessment of $4,500 against each member of the corporation in order to pay for rebuilding the dam and restoring the lake.[10] *Id.*

The taxpayer claimed a deduction under section 165(a) and (c)(3) for the $4,500 assessment that she paid to the corporation, which the Commissioner disallowed. *Id.*

The U.S. District Court for the Eastern District of Pennsylvania (District Court) held that the taxpayer was not entitled to a deduction under section 165(a) and (c)(3) for the assessment that she had paid to the corporation.[11] *Id.* at 741. In so holding, the District Court concluded:

> Plaintiff clearly has a property interest in her leasehold and in the cottage built on it. She has no property interest, however, in the dam or lake. Her right to use corporate property comes solely and entirely from her membership. This right is conferred by the corporate charter and by-laws. Her claim to a casualty loss deduction would have more force if her rights in the lake were granted by the lease. In that case her property interest in the leasehold might well be considered to extend to an easement in the lake. [*Id.*]

Respondent asserts that the facts in this case are analogous to the facts in *West* and that under *West* petitioner is not entitled to a deduction under section 165(a) and (c)(3) with respect to the claimed 2005 casualty loss.

---

[10] The respective taxpayers in *Orr v. Commissioner*, *supra*, and *Hine v. Tomlinson*, 11 AFTR 2d at 317, 63–1 USTC par. 9142, at 87,224–87,225, were members of the same corporation of which the taxpayer in *West* was a member and also claimed respective deductions under sec. 165(a) and (c)(3) for the respective amounts that they had paid to that corporation to repair the dam and restore the artificial lake that the hurricane had destroyed in 1955. In each of those cases, the Commissioner of Internal Revenue (Commissioner) disallowed the respective deductions that the taxpayers claimed.

[11] In *Orr v. Commissioner*, *supra*, we also held that the taxpayers were not entitled to a deduction under sec. 165(a) and (c)(3) for the assessment that they had paid to the corporation. In that case, we stated: "The opinions in the *West* case addressed themselves to the very issue that petitioner presents here and appeared to take into account the same considerations that are pressed upon us in the instant case. We think that the same result is called for here."

In *Hine v. Tomlinson*, 11 AFTR 2d at 318, 63–1 USTC par. 9142, at 87,225, the U.S. District Court for the Middle District of Florida also held that the taxpayer was not entitled to a deduction under sec. 165(a) and (c)(3) for the assessment that she had paid to the corporation. In that case, that court stated: "*West* and *Orr* were also cases based upon damages claimed to have resulted from the destruction of dam and lake at Pocono Lake Preserve. This Court approves and adopts the reasoning of Grim, J., in *West* as being sound and directly applicable to the present case." *Id.*

Petitioner counters that *Keith v. Commissioner*, 52 T.C. 41 (1969), is "more recent and more relevant" than *West* with respect to the issue presented here.

In *Keith*, a corporation owned a certain tract of land in Alabama on which it constructed a dam for the purpose of enlarging a lake that existed on the land. *Id.* at 41–42. Thereafter, the corporation recorded a restrictive covenant on that tract of land and subdivided the tract into several lots. *Id.* at 42–43. The corporation then transferred by deed those lots to the respective stockholders of the corporation. *Id.* at 43. In *Keith*, we described the property to which those deeds pertained as follows:

The deeds covered the entire lakebed as well as the adjoining land. None of these deeds, or any other deeds involved in this case, indicate the portion, if any, of the property described therein that was covered by Green Valley Lake, beyond referring to the restrictive covenant. * * * [*Id.*]

The taxpayer husband in *Keith* purchased two lots from the respective original owners of those lots, who transferred those lots to the taxpayer husband by deed. *Id.* A portion of the land transferred under the deed pertaining to each lot was "under the waters of the lake." *Id.* Shortly after the taxpayer husband in *Keith* purchased the two lots, a flood destroyed the dam, thereby causing the lake to drain completely. *Id.* The corporation decided to rebuild the dam. *Id.* at 43–44. The corporation paid the cost of that rebuilding by levying an assessment against the stockholders of the corporation in amounts that were proportionate to their respective stock interests in the corporation. *Id.* at 44.

The taxpayer husband and the taxpayer wife filed a joint return on which they claimed a deduction under section 165(a) and (c)(3) for the assessment that the taxpayer husband had paid to the corporation. *Id.* The Commissioner disallowed that claimed deduction. *Id.*

We held in *Keith* that the taxpayers were entitled to deduct under section 165(a) and (c)(3) the assessment that the taxpayer husband paid to the corporation. *Id.* at 48. In so holding, we distinguished the facts in *Keith* from the facts in *West v. United States*, 163 F. Supp. 739 (E.D. Pa. 1958). In doing so, we stated:

Here petitioner's [taxpayer husband's] rights in the lake did not stem from his ownership of stock in GVI [the corporation]; indeed neither the certifi-

cate of incorporation nor the bylaws of GVI even purport to confer any such rights. * * * Petitioner's rights in the lake stemmed primarily from his ownership in fee (not merely a lease), subject to the restrictive covenant, of a portion of the lakebed and the land adjoining the lake. While the restrictive covenant limited his rights in the lake in certain respects, it also conferred certain rights on him with respect to the use of the lake as well as the adjoining property, e.g., the right to go across the property of the other lot owners for recreational purposes.

Disregarding for the moment the restrictive covenant, we think it apparent that petitioner, by virtue of his warranty deeds to a part of the lakebed and to the adjoining land, possessed valuable property rights in the lake which were destroyed by the flood. * * *

[*Keith v. Commissioner*, *supra* at 46; fn. ref. omitted.]

According to petitioner, *Keith* addresses

the specific situation contemplated in *West*, whether a shareholder was entitled to a casualty loss deduction when his right to the damaged property, also a lake in this instance, was conferred by lease, thus giving petitioner an easement to use the lake. * * * The Court concluded * * * that the petitioner possessed valuable property rights in the lake which were destroyed by the flood, likening the petitioner's rights to an equitable easement for the benefit of the shareholders rather than for the benefit of the corporation, thus allowing petitioner to take a casualty loss deduction. * * *

Petitioner asserts that the facts in the instant case are analogous to the facts in *Keith* and that *Keith* is controlling here. According to petitioner, she had "property rights in the use of the apartment and related grounds" under the model proprietary lease, "combined with the [Castle Village board] house rules and memoranda of the [Castle Village] Board of Directors, as well as the corporate Charter and By-Laws". Petitioner claims that the Castle Village board house rules "gave Petitioner the reasonable use of the common areas and grounds" and that she "must be considered to have possessed valuable property rights, something akin to an equitable easement * * * in the Castle Village property which was destroyed by the collapse of the [Castle Village] retaining wall. [12]

---

[12] In support of petitioner's claims, petitioner advances the following assertions:

While title to the Castle Village grounds and buildings rest [sic] with the cooperative corporation [Castle Village], the unit owners, by virtue of their Proprietary Leases to the apartments, combined with the house rules and memoranda of the Board of Directors, as well as the corporate Charter and By-Laws, had property rights in the use of the apartment and related grounds, so that their loss was the damage to the grounds which directly affected the apartments and the inability to use the related grounds, as well as the damage thereto.

In *Keith*, the Board of Directors granted the deed to the lots to the owners (who were share-

We reject not only petitioner's assertions regarding *Keith v. Commissioner*, 52 T.C. 41 (1969), but also her assertions regarding her alleged property interest in the common areas and the common grounds of the Castle Village complex (Castle Village grounds) that she claims entitles her to a casualty loss deduction.

With respect to petitioner's assertions regarding *Keith*, petitioner is wrong in asserting that *Keith* addresses whether a stockholder is entitled to a casualty loss deduction where the stockholder possesses rights to the damaged property under a lease. The rationale for our holding in *Keith* was our finding that the taxpayer husband, "by virtue of his warranty deeds to a part of the lakebed and to the adjoining land, possessed valuable property rights in the lake which were destroyed by the flood." [13] *Id.* at 46. We expressly stated in *Keith* that the taxpayer husband's rights in the drained lake "stemmed primarily from his ownership in fee (not merely a lease) * * * of a portion of the lakebed and the land adjoining the lake." [14] *Id.* (fn. ref. omitted).

With respect to petitioner's assertions regarding her alleged property interest in the Castle Village grounds, petitioner is wrong in asserting that she possesses a property interest in those grounds that entitles her to a casualty loss deduction for damage to those grounds. We have carefully considered the model proprietary lease, the Castle Village

---

holders), and also the Board approved and issued the restrictive covenants which gave and stated the reasonable use of the lake for the lot owners. *Id.* at 42–43. In the case at hand, Petitioner acquired her Proprietary Lease (and stock) which, in effect, gave Petitioner title to her apartment and included the Board approved House Rules, which also gave Petitioner the reasonable use of the common areas and grounds. Even the Corporate Charter and By-Laws make it plain that the Corporation's purpose is to provide apartment cooperative ownership for the residents, and this clearly reasonably included residential use of the common areas and grounds (as provided in the By-Law provision with respect to House Rules). Thus, by the Court's rationale in *Keith*, Petitioner must be considered to have possessed valuable property rights, something akin to an equitable easement for the benefit of the shareholders rather than for the benefit of the corporation, in the Castle Village property which was destroyed by the collapse of the retaining wall, and Petitioner must be allowed to take a casualty loss deduction.

[13] We found in *Keith v. Commissioner*, 52 T.C. 41, 46 (1969), that under the applicable law of Alabama "The owners of the land underlying an artificial lake and the land bordering upon such lake have property rights in the water by virtue of their ownership of the land. These rights include the right to make reasonable use of the lake."

[14] Petitioner also is wrong in asserting that in *Keith* we were "likening the petitioner's rights to an equitable easement for the benefit of the shareholders rather than the benefit of the corporation". In *Keith v. Commissioner*, *supra* at 47–48, we found that the corporation, and not the taxpayer, possessed an equitable easement over the lake for the benefit of the corporation's stockholders. As discussed above, we found in *Keith* that the taxpayer husband possessed a property interest in the lake because of certain deeds under which respective portions of the lakebed were transferred to him. *Id.* at 46.

board house rules, the corporate charter of Castle Village, and the bylaws of Castle Village on which petitioner relies in support of her assertion that she has such a property interest in the Castle Village grounds.[15] We find nothing in those documents that allows us to conclude that petitioner possessed a leasehold interest, an easement, or any other property interest in the Castle Village grounds that entitles her to a deduction under section 165(a) and (c)(3) for damage to those grounds.

As for the model proprietary lease and the Castle Village board house rules that were made part of that lease by paragraph 13 thereof, that lease provided that Castle Village leased to the tenant "Apartment _____ in the building at _____ Cabrini Boulevard" and that that apartment consisted of

the rooms in the buildings * * * designated by the above-stated apartment number, together with their appurtenances and fixtures and any closets, terraces, balconies, roof, or portion thereof outside of said partitioned rooms, which are allocated exclusively to the occupant of the apartment.

The model proprietary lease did not provide that Castle Village leased to petitioner any portion of the Castle Village grounds and did not provide that Castle Village granted to her any other property interest in those grounds. Although petitioner, like the other stockholders of Castle Village, had the right to use the Castle Village grounds subject to the Castle Village board house rules regarding the use of those grounds that were made part of the model proprietary lease by paragraph 13 thereof, we conclude that that lease and those rules did not grant to petitioner a leasehold interest, an easement, or any other property interest in the Castle Village grounds that entitles her to a deduction under section 165(a) and (c)(3) for damage to those grounds.

As for the corporate charter and bylaws of Castle Village, we find nothing in those documents that grants to petitioner, a stockholder of Castle Village, any property interest in the Castle Village grounds. We conclude that the corporate charter and bylaws of Castle Village do not grant to petitioner a leasehold interest, an easement, or any other property interest in the Castle Village grounds that entitles her

_____
[15] The record does not contain the memoranda of the Castle Village board on which petitioner also relies.

to a deduction under section 165(a) and (c)(3) for damage to those grounds.

On the record presented to us for purposes of respondent's motion, we conclude that the facts in the instant case are analogous to the facts in *West v. United States*, 163 F. Supp. 739 (E.D. Pa. 1958), and are not analogous to the facts in *Keith v. Commissioner*, 52 T.C. 41 (1969). Accordingly, we conclude that "the same result [as in *West*] is called for here." *Orr v. Commissioner*, T.C. Memo. 1960–147. We hold that petitioner is not entitled to a deduction under section 165(a) and (c)(3) with respect to the claimed 2005 casualty loss.

We consider now petitioner's alternative argument under section 216(a). [16] Section 216(a) provides in pertinent part:

SEC. 216(a). ALLOWANCE OF DEDUCTION.—In the case of a tenant-stockholder (as defined in subsection (b)(2)), there shall be allowed as a deduction amounts (not otherwise deductible) paid or accrued to a cooperative housing corporation within the taxable year, but only to the extent that such amounts represent the tenant-stockholder's proportionate share of—

(1) the real estate taxes allowable as a deduction to the corporation under section 164 which are paid or incurred by the corporation on the houses or apartment building and on the land on which such houses (or building) are situated, or

(2) the interest allowable as a deduction to the corporation under section 163 which is paid or incurred by the corporation on its indebtedness contracted—

(A) in the acquisition, construction, alteration, rehabilitation, or maintenance of the houses or apartment building, or

(B) in the acquisition of the land on which the houses (or apartment building) are situated.

(For convenience we shall refer to a tenant-stockholder of a cooperative housing corporation as a stockholder of a cooperative housing corporation.)

Section 216(a) allows two exceptions to the general rule that a stockholder of a corporation is not entitled to deduct the corporation's expenses that the corporation paid or incurred. See *Evans v. Commissioner*, 557 F.2d 1095, 1099–1100 (5th Cir. 1977), affg. in part and revg. in part T.C. Memo. 1974–267. Those exceptions are for (1) real estate taxes that the corporation pays or incurs on the property

---

[16] Sec. 216(c) on which petitioner does not rely provides that the stock of a cooperative housing corporation owned by a so-called tenant-stockholder of that corporation is to be treated as property subject to the allowance for depreciation to the extent that the proprietary lease or right of occupancy conferred by reason of such stockholder's ownership of that stock is used in a trade or business or for the production of income.

that it owns and (2) interest that the corporation pays or incurs on debt that it issued in order to, inter alia, acquire or construct the land or buildings that it owns.

Petitioner asserts that section 216(a) should be interpreted to permit not only the two deductions that that section expressly allows, but also the casualty loss deduction that she claims here. According to petitioner:

The stated purpose of I.R.C. § 216 and its predecessor, I.R.C. § 23(z) is to give tenants-stockholders of housing cooperatives the same tax benefits as are allowed to homeowners. *Eckstein v. United States*, 452 F.2d 1036, 1048 (Ct. Cl. 1971) *citing* S.Rep.No. 1631, 77th Cong. 2nd Sess. (1942–2 Cum.Bull. 504). The purpose of I.R.C. § 216 is not in dispute; the code section was enacted to place tenant-shareholders on equal footing with homeowners by allowing deductions for amounts paid to the corporation for mortgage interest and property taxes to "pass through" to the tenant-shareholders. * * *

* * * * * * *

Respondent would have this Court believe that any deduction not specifically included in I.R.C. § 216 is prima facie evidence of its disallowance. This is clearly not the case as evidenced by allowable tenant-shareholder deductions found elsewhere in the Code and by the decision in *Keith* allowing the shareholders a casualty loss deduction. * * * Congress recognized that tenant-shareholders required more benefits to be treated equitably under the tax code, thus it enacted additional provisions such as I.R.C. §§ 163 and 121.

As the Supreme Court of the United States has held, "Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent." *Andrus v. Glover Constr. Co.*, 446 U.S. 608, 616–617 (1980). Petitioner does not cite any legislative history establishing that Congress intended section 216(a) to permit the stockholders of a cooperative housing corporation to deduct any of such corporation's expenses that it paid or incurred except for the two deductions that Congress expressly allowed in that section. Indeed, the following legislative history of section 23(z) of the Internal Revenue Code of 1939 (1939 Code), as amended by the Revenue Act of 1942, ch. 619, sec. 128, 56 Stat. 826, a predecessor of section 216, establishes that Congress did not have any such intention:

The general purpose of this provision [section 23(z) of the 1939 Code] is to place the tenant stockholders of a cooperative apartment in the same

position as the owner of a dwelling house *so far as deductions for interest and taxes are concerned*. [S. Rept. 1631, 77th Cong., 2d Sess. (1942), 1942–2 C.B. 504, 546; emphasis added.]

We conclude that Congress intended in section 216(a) to allow the stockholders of a cooperative housing corporation deductions solely for amounts attributable to such corporation's real estate taxes and mortgage interest that it paid or incurred with respect to property that it owns. We hold that petitioner is not entitled to a deduction under section 216(a) with respect to the claimed 2005 casualty loss.

We have considered all of the contentions and arguments of the parties that are not discussed herein, and we find them to be without merit, irrelevant, and/or moot.

To reflect the foregoing,

*An order granting respondent's motion and decision for respondent will be entered.*